```
            THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF TEXAS
                   SHERMAN DIVISION

                  *  *  *  *  *

UNITED STATES OF AMERICA      *    4:22-MJ-0011-KPJ-1
                              *    Plano, Texas
VS.                           *    10:53 a.m. - 12:42 p.m.
                              *    03:14 p.m. - 03:34 p.m.
ELMER STEWART RHODES, III     *    January 24, 2022

                  *  *  *  *  *
```

**DETENTION HEARING**

BEFORE THE HONORABLE KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE

```
                  *  *  *  *  *
```

Proceedings recorded by electronic sound recording
Transcript produced by transcription service

*GLR TRANSCRIBERS*
9251 Lynne Circle
Orange, Texas 77630 * 409-330-1610

1   **APPEARANCES:**

2   For the United States:

3         MS. KATHRYN L. RAKOCZY
          **U.S. Attorney's Office**
4         555 Fourth Street NW
          Washington, DC 20530
5
          MR. JUSTIN SHER
6         **United States Department of Justice**
          950 Pennsylvania Avenue NW
7         Washington, DC 20530

8   For the Defendant:

9         MR. PHILLIP A. LINDER
          **The Linder Firm**
10        3300 Oak Lawn Ave., Suite 700
          Dallas, TX 75219
11
          MR. JAMES L. BRIGHT
12        **James Lee Bright, Attorney At Law**
          2926 Maple Avenue, Suite 200
13        Dallas, TX 75201

14  Courtroom Deputy:

15        JANE AMERSON

16

17

18

19

20

21

22

23

24

25

1                    **WITNESS INDEX**

2   GOVERNMENT'S EVIDENCE:

3       Special Agent Michael Palian

4           Direct Examination by Ms. Rakoczy.......   6

5           Cross-Examination by Mr. Linder.........  49

6           Redirect Examination by Ms. Rakoczy.....  66

7           Recross-Examination by Mr. Linder.......  70

8           Examination by the Court................  71

9   DEFENDANT'S EVIDENCE:

10      Brian Bodine

11          Direct Examination by Mr. Linder........  76

12          Examination by the Court................  78

13  Argument by counsel.............................  84

14  FURTHER EVIDENCE BY DEFENDANT:

15      Benjamin (LNU)

16          Direct Examination by Mr. Linder........ 103

17          Cross-Examination by Ms. Rakoczy........ 106

18          Redirect Examination by Mr. Linder...... 107

19          Examination by the Court................ 107

20  EVIDENCE REOPENED BY THE COURT:

21      Tasha Vonn Adams Rhodes

22          Opening Statement by Ms. Adams.......... 110

23          Examination by the Court................ 111

24          Cross-Examination by Mr. Bright......... 113

25  Argument by counsel............................. 118

1                    **P R O C E E D I N G S**

2            **10:53 A.M. - JANUARY 24, 2022**

3          THE COURT:  No. 4:22-mj-11, United States vs.

4    Elmer Stewart Rhodes, III.

5          MS. RAKOCZY:  Good afternoon, Your Honor.

6    Kate Rakoczy and Justin Sher on behalf of the United

7    States.

8          THE COURT:  Good afternoon.

9          *[Pause]*

10         COURTROOM DEPUTY:  Would you raise your right

11   hand, please.  Do you solemnly swear the testimony you

12   are about to give in the case before the Court will be

13   the truth, the whole truth, and nothing but the truth,

14   so help you God?

15         DEFENDANT RHODES:  I do.

16         THE COURT:  We're here today for your

17   Detention Hearing.  Before we begin with testimony,

18   have both counsel received a copy of the Pretrial

19   Services Report?

20         MS. RAKOCZY:  Yes, Your Honor.

21         THE COURT:  Mr. Linder, have you received a

22   copy of the Pretrial Services Report?

23         MR. LINDER:  We received the one last week,

24   Your Honor.  And as you may be aware, we updated some

25   information today, but I don't know if Ms. Ruth made an

1   updated report or not, but we do have the original.

2            THE COURT:  I am not aware of that.  Can you

3   tell me which information that needs to be modified?

4            MR. LINDER:  We had entered information for a

5   third party custodian and things like that, but yeah,

6   no biographical information.

7            THE COURT:  Okay.  What about from the

8   Government?  Any information contained in this report

9   you'd request to be modified?

10           MS. RAKOCZY:  No, Your Honor.

11           THE COURT:  All right.  Mr. Rhodes, you may

12   have a seat at counsel table with your counsel.

13           MS. RAKOCZY:  Thank you, Your Honor.  If I

14   may, before we call our witness, we'd just like to put

15   on the record that we have provided to defense counsel

16   a copy of the discovery materials in this case that

17   have been available up to this point.  As the Court may

18   be aware, there is a related matter out of the District

19   of Columbia and we provided a copy in the form of

20   several -- two multiple terabyte hard drives to defense

21   counsel.  We also provided them with a letter that

22   highlighted some of the information that might be most

23   pertinent for this hearing today.

24           And, Your Honor, with that, the United

25   States calls Special Agent Michael Palian.

```
 1            COURTROOM DEPUTY:  Would you raise your right
 2   hand, please.  Do you solemnly swear the testimony you
 3   are about to give in the case before the Court shall be
 4   the truth, the whole truth, and nothing but the truth,
 5   so help you God?
 6            THE WITNESS:  I do.
 7            COURTROOM DEPUTY:  You may have a seat, please.
 8   And if you would state your name and spell it for the
 9   record.
10            THE WITNESS:  May I remove my mask?
11            THE COURT:  You may remove your mask.
12            THE WITNESS:  My name is Michael Palian.
13   That's spelled P-a-l-i-a-n.
14            THE COURT:  You may proceed, counsel.
15            MS. RAKOCZY:  Thank you, Your Honor.
16     SPECIAL AGENT MICHAEL PALIAN, CALLED BY THE GOVERNMENT
17                       DIRECT EXAMINATION
18   BY MS. RAKOCZY:
19   Q.   Sir, where are you employed?
20   A.   I'm employed with the FBI in Washington, DC.
21   Q.   How long have you been employed with the FBI?
22   A.   Just under 19 years.
23   Q.   And what is your current position or title?
24   A.   I'm a Special Agent with the FBI.
25   Q.   Have you been a Special Agent with the FBI your
```

1  entire time there?

2  A.   I have.

3  Q.   Special Agent Palian, did you participate in an

4  investigation into the attack on the United States

5  Capitol that occurred on January 6th of 2021?

6  A.   Yes.

7  Q.   And specifically, have you participated in an

8  investigation into the role of certain members and

9  affiliates of a group called the Oath Keepers in that

10  attack?

11  A.   I have.

12  Q.   Could you describe for the Court generally what you

13  have learned about the role played by certain members

14  and affiliates of the Oath Keepers in that attack?

15  A.   Sure.  Generally speaking, the Oath Keepers

16  planned, funded, recruited for, and executed a plan to

17  stop the transition of Presidential power.

18  Q.   With respect to January 6th, did certain members

19  and affiliates of the Oath Keepers actually breach the

20  Capitol building?

21  A.   They did breach the Capitol building, yes.

22  Q.   Could you describe for the Court generally what

23  that consisted of?

24  A.   Generally speaking, there were two groups of Oath

25  Keepers that breached the Capitol that day.  We've

1   labeled them Stack 1 and Stack 2.  Stack 1 consisted of

2   approximately 14 individuals that entered the Capitol

3   around 2:40 p.m.  Stack 2 consisted of five individuals

4   and a K-9 that breached the Capitol around 3:15.

5   Q.   With respect to that group that you've referred to

6   as Stack 1, was there an individual who was a

7   co-defendant in this matter who somewhat was in

8   leadership of that role as they breached the building?

9   A.   Yes, there was.

10  Q.   What's that individual's name?

11  A.   That individual's name is Kelly Meggs.

12  Q.   And is he a leader or was he at he time a leader of

13  the Florida Chapter of Oath keepers?

14  A.   Yes, he was the leader of the Florida Chapter of

15  the Oath Keepers.

16  Q.   With respect to that group you've referred to as

17  Stack 2, was there someone who took something of a

18  leadership role in leading that group into the building

19  on January 6th?

20  A.   Yes, there was.

21  Q.   What's that person's name?

22  A.   Joshua James.

23  Q.   And was he the leader of a chapter of Oath Keepers?

24  A.   He was the leader of the Alabama Chapter of Oath

25  Keepers.

1  Q.   Special Agent Palian, were there members and

2  affiliates of the Oath Keepers who supported those who

3  breached the building on January 6th, but did not

4  actually go inside the building?

5  A.   Yes, there were.

6  Q.   Were some of those individuals present on the

7  Capitol grounds outside of the building?

8  A.   They were present on the Capitol grounds, yes.

9  Q.   Were there also individuals who supported those who

10  breached the building who were not present on the

11  Capitol grounds?

12  A.   Correct, there were.

13  Q.   Where were those individuals stationed?

14  A.   Those individuals were stationed at a hotel in

15  Arlington, Virginia.

16  Q.   And what role were they playing?

17  A.   They played the role of the Quick Reaction Force or

18  QRF, as it's been called.

19  Q.   Is that your term or their term?

20  A.   That is their term.

21  Q.   Based on what you have learned through reading

22  messages that individuals who participated in that or

23  planned that Quick Reaction Force send among each

24  other, what was the purpose of that Quick Reaction

25  Force?

1   A.   The purpose of the Quick Reaction Force that day

2   was to prepare to bring weapons in support to the Oath

3   Keepers that were in Washington, DC should, as they put

4   it, the shit hit the fan.

5   Q.   Are you familiar with an individual named Elmer

6   Stewart Rhodes, III?

7   A.   I am.

8   Q.   And have you ever -- who is Mr. Rhodes?

9   A.   Mr. Rhodes is the founder and leader of the Oath

10  Keepers, the national Oath Keepers.

11  Q.   Have you met Mr. Rhodes in person?

12  A.   I have.

13  Q.   If you could, sir, I'd like for you to look around

14  the courtroom and let us know if you see Mr. Rhodes in

15  the courtroom here today.

16  A.   I see him sitting with his defense counsel.

17  Q.   Could you describe what he's wearing?

18  A.   Mr. Rhodes appears to be wearing, I guess it would

19  be a black and light blue jumpsuit.

20          MS. RAKOCZY:  May the record reflect, Your

21  Honor, the in-court identification of the defendant?

22          THE COURT:  Yes.

23          MS. RAKOCZY:  Thank you, Your Honor.

24  BY MS. RAKOCZY:

25  Q.   Special Agent Palian, have you investigation

1   whether the defendant played a role in the attack on

2   the Capitol?

3   A.   I have.

4   Q.   Could you describe for the Court in general terms

5   what that role was?

6   A.   Sure.  In general terms, Mr. Rhodes coordinated,

7   offered to fund, and facilitated the attack on the

8   Capitol.

9   Q.   Special Agent Palian, I'd like to direct your

10  attention to the days and weeks following the 2020

11  United States Presidential election.  Did Mr. Rhodes

12  around that time disseminate messages that your

13  investigation has deemed to have been relevant to the

14  conspiracy alleged in the Indictment?

15  A.   Yes, messages were disseminated.

16  Q.   Could you describe for the Court some of those

17  messages?

18  A.   Sure.  Those messages took various forms.  They

19  took the form of signal messages or text messages or

20  phone calls.  But the messages' content revolved around

21  planning for the event and discussed some of the intent

22  of the operation.

23  Q.   We're going to bring up on the screen right now,

24  with the Court's permission, what's been marked as

25  Government's Exhibit No. 1.

 1          MS. RAKOCZY:  May I do that, Your Honor?

 2          THE COURT:  Any objection?

 3          MR. LINDER:  No, Your Honor.  As counsel has

 4  explained, she provided this to us already.

 5          THE COURT:  All right, you may publish.

 6          MS. RAKOCZY:  Thank you, Your Honor.

 7  BY MS. RAKOCZY:

 8  Q.  Special Agent Palian, I've placed up on the screen

 9  what has been labeled as Government's Exhibit No. 1 for

10  the purposes of this Detention Hearing.

11          MS. RAKOCZY:  And I apologize to the Court

12  because of the PowerPoint.  It actually says

13  Government's Exhibit No. 2, but it is labeled as

14  Government's Exhibit 1 on the hard copy that we

15  provided to the Court and counsel.

16  BY MS. RAKOCZY:

17  Q.  Special Agent Palian, do you recognize what we're

18  seeing on the screen?

19  A.  Yes, I do recognize it.

20  Q.  Can you describe in general terms what it is?

21  A.  Sure.  This is a Signal message from a Signal chat

22  group that was named The Old Leadership Chat and the

23  message was sent by Mr. Rhodes on November 7th.

24  Q.  Is this a copy of the message that you obtained

25  from a search of the defendant's phone?

1  A.   I did obtain this from this defendant's phone, yes.

2  Q.   And did you conduct that search pursuit to a

3  warrant?

4  A.   Yes, I did.

5  Q.   Does this appear to be a fair and accurate copy of

6  the message that we're about to talk about?

7  A.   Yes, it's fair and accurate.

8          MS. RAKOCZY:   Your Honor, for the purposes of

9  this hearing, we would seek to move Government's

10 Exhibit No. 1 into evidence.

11         THE COURT:   Any objection?

12         MR. LINDER:   No objection.

13         THE COURT:   All right, it's admitted as

14 Government's Exhibit 1.

15 BY MS. RAKOCZY:

16 Q.   Special Agent Palian, this group chat that's called

17 Old Leadership Chat, you said it was taken from an

18 application called Signal; is that right?

19 A.   Yes.

20 Q.   What is Signal?

21 A.   Signal is an encrypted text messaging application.

22 Q.   Okay.  And you mentioned that this was a group

23 chat.  What does that mean?

24 A.   A group chat means there's more than two

25 participants in the message.

1  Q.  Was the defendant, Mr. Rhodes, a participant in

2  this chat?

3  A.  He was and he was the author of this message.

4  Q.  Okay.  Were there other co-defendants who were

5  charged in this conspiracy as participants in this chat?

6  A.  Yes.

7  Q.  For example, was co-defendant Kelly Meggs a

8  participant in this chat?

9  A.  Kelly Meggs was a participant, yes.

10  Q.  And perhaps not at this time, but later in time

11  relevant to this conspiracy, were Jessica Watkins and

12  Joshua James participants in this chat?

13  A.  Yes, both those defendants were also participants.

14  Q.  The chat, when was this message that we have up on

15  the screen now sent by Mr. Rhodes?

16  A.  November 7, 2020.  I can't tell the time because it

17  appears to be covered up by the --

18  Q.  Okay.  On your screen it's --

19  A.  On my screen it's covered, but I think it's

20  12:25 p.m. Eastern Standard Time, if I can see it

21  correctly.  I think that says 11:25 UTC minus six.

22  Q.  Special Agent Palian, when the message begins, it

23  begins, "I am in direct context with the Serbian author

24  of that video."  Based on reading the full contents of

25  this chat, do you know what video Mr. Rhodes is

1  referring to?

2  A.   Yes, I do.

3  Q.   Can you explain for the Court?

4  A.   Sure.  The video Mr. Rhodes is referring to comes

5  from Serbia and it was steps taken by Serbian citizens

6  after the election of Slobodan Milosevic.

7  Q.   And did that video describe those steps?

8  A.   It did.

9  Q.   Could you then just read us then what Mr. Rhodes

10  goes on to say about that video?

11  A.   Sure.  "His videos are excellent.  Here is his

12  written advice to us:

13        "What we have done and what you probably need

14  to do.  Peaceful protests good, well played, round one.

15  A complete civil disobedience.  They are not your

16  representatives.  They are a foreign puppet government.

17  Connect with the local police and start organize by

18  neighborhoods to stay safe (we didn't need this step).

19  We swarmed the streets and started confronting the

20  opponents.  I know, not nice, but it must be done if

21  the institutions stop to exist.  Millions gathering in

22  our Capitol.  There were no barricades strong enough to

23  stop them nor police determined enough to stop them.

24  Police and military align with the people after a few

25  hours of fist fight.  We swarmed the Parliament and

1   burned down the fake state television.  We won.

2   However, we made a mistake.  We have not removed all of

3   his people from their positions.  That was the one

4   mistake.  They are going  to fight to the end.  You

5   must do the same."

6   Q.   Thank you.  That's sufficient, Special Agent Palian.

7           MS. RAKOCZY:  We can advance now and take that

8   down from the screen.

9   BY MS. RAKOCZY;

10  Q.   Special Agent Palian, did the defendant also

11  organize virtual meetings to discuss plans for this

12  plan that he was setting forth?

13  A.   He did organize virtual meetings, yes.

14  Q.   Did they use a particular site for those meetings?

15  A.   Yes, they did.

16  Q.   Could you tell the Court what that site was?

17  A.   Sure.  The site was GoToMeeting, which is a

18  web-based application which multiple participants can

19  log in.  There's a video component to it.  It's akin to

20  Zoom, which I think most people are familiar with.

21  Q.   And did Mr. Rhodes host meetings shortly after the

22  Presidential election to discuss similar plans to what

23  he described in that message that you just read to the

24  Court?

25  A.   He did.

1  Q.   Did he send similar messages to what we just read --

2  what you just read for the Court to other Signal group

3  chats?

4  A.   Yes, he did.

5  Q.   And were co-defendants in the current Indictment

6  present and participating in some of those group chats?

7  A.   They were.

8  Q.   In these messages did the defendant discuss the

9  need for an armed force or the term Quick Reaction

10  Force that you used to support operations in

11  furtherance of this plan?

12  A.   He did.

13  Q.   And specifically, did he discuss the need for such

14  an armed force in any of the GoToMeetings?

15  A.   He did discuss it in the GoToMeetings, yes.

16  Q.   Can you describe for the Court any such

17  GoToMeetings that you remember?

18  A.   Yeah, I recall one from November 9th where

19  Mr. Rhodes discussed that they were in a similar

20  position to 1775, March of 1775, and their quote that

21  they would only await the President's orders.  However,

22  this was to give them official cover, I think was the

23  term used.  This is going to be our cover story or

24  official cover.

25  Q.   When comparing the position of themselves and his

 1   followers to March of 1775, what is the significance of
 2   that date, if you know?
 3   A.   Yeah.  So March 1st of 1775 was exactly seven weeks
 4   before the first shot in the Civil War was fired on
 5   April 19, 1775 at Lexington.
 6   Q.   You just said Civil War.  Is that --
 7   A.   I'm sorry, Revolutionary War, I apologize.  Thank
 8   you.
 9   Q.   Special Agent Palian, at some point did the
10   defendant focus his co-conspirators on the date of
11   January 6, 2021 as a date where they might put their
12   plans into action?
13   A.   Yes, he did.
14   Q.   What is, if you know, the significance of January
15   6th?
16   A.   January 6th is when the certification of the
17   electoral votes in Congress was to occur.
18   Q.   Can you tell the Court in what context you saw the
19   defendant articulating January 6th as an important date?
20   A.   Sure.  There was an interview that Mr. Rhodes did
21   with an individual named Mike Adams in middle December,
22   and he referenced January 6th as a hard constitutional
23   deadline.
24   Q.   Did the defendant discuss during that interview
25   what he and his followers might do if Congress did not

1  step in or someone did not step in to stop the

2  certification of the electoral college vote?

3  A.   Mr. Rhodes, I believe it was in that interview,

4  talked about the bloody -- massively bloody -- I'm

5  paraphrasing, but I think that's what it was, massively

6  bloody civil war which would ensue.

7  Q.   Did the defendant also discuss the importance of

8  January 6th on some of the Signal group chats that

9  you've described?

10 A.   Yes.

11 Q.   Are you familiar with a Signal group chat called

12 Okay FL Hangout?

13 A.   Yes, I am familiar with that.

14 Q.   Did you obtain a copy of this group chat from the

15 defendant's cellular telephone when you searched it?

16 A.   Yeah, we did.

17 Q.   Who primarily was participating in that group chat?

18 A.   Primarily, that chat was for the Florida Chapter of

19 the Oath Keepers, but there were some national members

20 that were involved, too.

21 Q.   Were co-defendants from the Florida Chapter

22 participants -- co-defendants in this Indictment from

23 the Florida Chapter participants in that group chat?

24 A.   Yes, the co-defendants were participants.

25 Q.   Were Kelly Meggs, Kenneth Harrelson, Joseph

1  Hackett, and David Moerschel participants in that chat?

2  A.   They were.

3  Q.   Was the defendant a participant in that chat?

4  A.   He was.

5  Q.   On that chat did the defendant and others make

6  statements that mentioned the need to scare or

7  intimidate members of Congress on January 6th?

8  A.   Yes, that was referenced.

9          MS. RAKOCZY:  With the Court's permission, I'd

10  like to publish Government's Exhibit No. 2 at this time.

11          THE COURT:  Any objection?

12          MR. LINDER:  We've seen it, Your Honor.  No

13  objection.

14          THE COURT:  All right.  And Mr. Linder, I

15  wanted to go back to you.  No objection to it being

16  admitted into evidence?

17          MR. LINDER:  Correct.  I assume they're only

18  going to offer the ones they've given us.  We've seen

19  them.  No objection.

20          THE COURT:  All right, so Government Exhibit 2

21  is admitted and you may publish.

22          MS. RAKOCZY:  Thank you, Your Honor.

23  BY MS. RAKOCZY:

24  Q.   Special Agent Palian, I've brought Government's

25  Exhibit 2 up on the screen.  Do you recognize this?

1  A.   I do recognize it.

2  Q.   And is this -- are these two chats that were pulled

3  from that Okay FL Hangout that you recovered from the

4  defendant's phone?

5  A.   Yes, they were.

6  Q.   Were these chats sent in late December of 2020?

7  A.   Yes.

8  Q.   The first chat says that it is from a user called

9  [OkGator1].  Based on your investigation, do you know

10  who that person is.

11  A.   I do know who that person is.

12  Q.   Who utilized that moniker?

13  A.   Kelly Meggs, one of the co-defendants in this case.

14  Q.   And on December 23, 2020, could you read the Court

15  the message that Mr. Meggs sent to that chat.

16  A.   Sure.  December 23, 2020.  "We need to surround the

17  Capitol all the way around with patriots screaming so

18  that they hear us inside.  Scare the hell out of them

19  with about a million surrounding them should do the

20  trick."

21  Q.   Did Mr. Rhodes send a message on December 25th,

22  then, of 2020 to the same chat?

23  A.   He did.

24  Q.   Could you read the Court Mr. Rhodes' message.

25  A.   "I think Congress will screw him over.  The only

1   chance we/he has is if we scare the shit out of them

2   and convince them it will be torches and pitchforks

3   time is" -- and I think he meant if -- "is they don't

4   do the right thing.  But I don't think they will

5   listen."

6   Q.   Thank you, Special Agent Palian.  We can take that

7   off the screen.

8          Special Agent Palian, you read us at the

9   outset of your testimony a message that was from a chat

10  that was called Old Leadership Chat; do you recall that?

11  A.   Yes.

12  Q.   Did that chat, contemporaneously with this case in

13  around the time of November 2020 through January of

14  2021, did that chat operate under a different name?

15  A.   Yes, it did.

16  Q.   And was that chat called Leadership Intel Sharing

17  Secure, or words to that effect?

18  A.   Yes.

19  Q.   Did you uncover a message that Defendant Rhodes

20  sent to that Leadership Intel chat around the end of

21  December, December 31st of 2020?

22  A.   Yes, we did.

23  Q.   Do you recall that's just where the defendant said

24  to those on the chat, "There is no standard political

25  or legal way out of this"?

1  A.   Yes.

2  Q.   Based on the context of that conversation, are you

3  aware of what the "this" was that he was referring to?

4  A.   This meaning the general situation that surrounded

5  the election, I believe.

6  Q.   In reviewing the Signal chats on the defendant's

7  phone, did the defendant regularly use the words "civil

8  war" and "revolution" to refer to what he and his

9  co-conspirators may need to do?

10 A.   He regularly used those terms, yes.

11 Q.   Special Agent Palian, did the defendant facilitate

12 planning and coordination among his co-conspirators for

13 January 6th?

14 A.   He did.

15 Q.   Could you tell the Court a little bit about what he

16 did?

17 A.   Sure.  He was involved in QRF planning, he was

18 involved in bringing people to the Capitol.  He offered

19 to fund several parts of the operation.

20 Q.   Did the defendant participate in or administer

21 certain group chats that surrounded planning for the

22 6th?

23 A.   He did.

24 Q.   Did those chats -- was one of those chats entitled

25 DC OP: JAN 6 '21?

1  A.   Yes, that was one of them.

2  Q.   And with respect to that chat, were other

3  co-defendants in the Indictment present in that chat?

4  A.   Yes, other co-defendants were present.

5  Q.   And specifically, were any defendants who

6  participated in the Quick Reaction Force present in

7  that chat?

8  A.   Yes.

9  Q.   Who was present in that chat?

10 A.   It was Edward Vallejo.

11         MS. RAKOCZY:  I'm going to bring up on the

12 screen now, with the Court's permission, Government's

13 Exhibit No. 3.

14         MR. LINDER:  No objection.

15         THE COURT:  All right, government's Exhibit 3

16 is admitted and you may publish.

17         MS. RAKOCZY:  Thank you, Your Honor.

18 BY MS. RAKOCZY:

19 Q.   Special Agent Palian, do you recognize Government's

20 Exhibit No. 3?

21 A.   Yes.

22 Q.   Is this an excerpt of another group chat that you

23 recovered from the defendant's phone?

24 A.   Yes, it is.

25 Q.   What is the name of this group chat?

1  A.   DC OP: JAN 6 '21.

2  Q.   And can you describe for the Court what the

3  defendant is saying in these two messages?

4  A.   Sure.  "New Year's Eve 2020.  Annex and move the NC

5  leaders and experience prior op veterans from NC."  And

6  then about a minute later, "Let's make sure that anyone

7  in Oath Keepers" -- I think he meant Oath Keepers, not

8  Oath Keepera -- "who is a team leader who will be

9  bringing a team is on this chat."

10 Q.   And reviewing that group chat, Special Agent

11 Palian, were the "team leaders" from various regional

12 chapters of Oath Keepers all participants in that chat?

13 A.   Yes, they were.

14 Q.   And was this chat used to discuss plans for January

15 6th?

16 A.   It was.

17      MS. RAKOCZY:  Thank you.  You can take that

18 message down.

19 BY MS. RAKOCZY:

20 Q.   Special Agent Palian, you mentioned a minute ago

21 that the defendant offered to fund or did fund aspects

22 of planning and coordination for the 6th.  Could you

23 tell the Court exactly what you have learned?

24 A.   Sure.  Mr. Rhodes offered to pay for hotel rooms,

25 but they were already taken care of at that point.  He

1    also had an individual who he had put in charge of

2    several of the aspects who had an Oath Keepers credit

3    card, who could have paid for things, too.

4    Q.   Did Mr. Rhodes offer to reimburse for the cost of

5    supplies, like maps and communications devices?

6    A.   He did.

7    Q.   You mentioned a moment ago that the defendant

8    participated in planning for the Quick Reaction Force.

9    Did the defendant articulate the idea of having a Quick

10   Reaction Force for January 6th?

11   A.   He articulated a Quick Reaction Force, yes.

12   Q.   And where did you see such messages?

13   A.   In the Signal messages.

14   Q.   Did he also post messages about having a Quick

15   Reaction Force to the Oath Keepers website?

16   A.   He did.

17   Q.   And did he do so specifically in a call to action

18   for his members and affiliates coming to Washington, DC

19   for January 6th?

20   A.   Yes, several days beforehand.

21   Q.   Did the defendant also exchange messages with some

22   of his co-conspirators regarding the planning and

23   facilitation of the Quick Reaction Force?

24   A.   He did.

25   Q.   Did people who were planning and participating in

1   the Quick Reaction Force keep Mr. Rhodes updated on

2   their plans?

3   A.   They did keep him updated.

4   Q.   During the course of your investigation, have you

5   found evidence that there were firearms contributed to

6   this Quick Reaction Force?

7   A.   Firearms were contributed.

8   Q.   And what are you basing that on?

9   A.   We have statements from witnesses and we have

10  camera footage from the hotel itself.

11  Q.   Special Agent Palian, are you aware of whether the

12  defendant brought any firearms or firearms parts or

13  related equipment to the Washington, DC area for

14  January 6th?

15  A.   He did bring firearms parts and accessories to the

16  DC area.

17  Q.   How are you aware of that?

18  A.   We conducted a financial investigation into his

19  purchases, including those coming to the DC area.  We

20  found that the defendant purchased over $20,000 in

21  firearms and firearms related accessories on his way up

22  to DC.

23  Q.   And so the receipts that you've recovered show that

24  such purchases were made at stores along the route?

25  A.   Yes.

1  Q.   Special Agent Palian, on January 6th of 2021,

2  roughly when were the Capitol grounds first breached?

3  A.   On January 6th the grounds were breached at the

4  Peace Fountain at approximately 12:52, 12:53, just

5  before 1:00 p.m.

6  Q.   And approximately when was the Capitol building

7  itself breached for the first time?

8  A.   The doors to the Capitol itself, about 2:00 p.m.

9  or around.

10 Q.   Around that time that the Capitol building is being

11 breached around 2:00 p.m., are you aware where the

12 defendant was?

13 A.   Yes, the defendant was coming onto the Capitol

14 grounds at about that time, slightly later.

15 Q.   Have you reviewed surveillance footage that shows

16 the defendant entering the Capitol grounds around that

17 time?

18 A.   I have.

19 Q.   And have you reviewed Signal chat messages where

20 the defendant tells others that he's going to the

21 Capitol grounds around that time?

22 A.   Yes.

23 Q.   Special Agent Palian, did the defendant give any

24 directives to those on those group chats that we've

25 been talking about, about what they should do around

1   2:00 p.m. on January 6th?

2   A.   Yeah, he did give directives.

3   Q.   And what did he say?

4   A.   The defendant was telling the co-conspirators where

5   they needed to go to.  At one point he was telling them

6   the south side of the Capitol.  At another point it was

7   the northeast corner.

8            MS. RAKOCZY:  With the Court's permission now,

9   Your Honor, we would like to move into evidence and

10  publish Government's Exhibit No. 4.

11           MR. LINDER:  No objection.

12           THE COURT:  All right.  It's admitted and you

13  may publish.

14           MS. RAKOCZY:  Thank you, Your Honor.

15  BY MS. RAKOCZY:

16  Q.   Bringing up on the screen now Government's Exhibit

17  No. 4, Special Agent Palian, do you recognize the

18  messages that are on the screen now?

19  A.   Yes, I do.

20  Q.   And are these messages from a group chat that was

21  recovered from the defendant's phone?

22  A.   Yes.

23  Q.   What is the title of this message group chat?

24  A.   DC Jan 5/6 DC OP Intel Team.

25  Q.   Was the defendant a participant in this chat?

1  A.   He was.

2  Q.   Was co-defendant Joshua James a participant in this

3  chat?

4  A.   Mr. James was also a participant, yes.

5  Q.   Was a person who the defendant put in charge of

6  operations for the January 6th operation on this chat?

7  A.   Yes.

8  Q.   Special Agent Palian, at the start, can you tell

9  the Court roughly when these messages are being

10  exchanged?

11  A.   So these messages all are on January 6th.   The

12  first message occurs at about 1:36 p.m. Eastern

13  Standard Time.

14  Q.   And just to explain for the Court, these messages

15  were recovered from the defendant's phone; is that

16  right?

17  A.   Correct, they were.

18  Q.   And at the time of seizure, that phone was located

19  in a Central Time Zone; is that right?

20  A.   Which is why all the messages are in Central Time,

21  yes.

22  Q.   Thank you.

23          Special Agent Palian, this exchange begins

24  with someone posting, "Patriots have stormed the

25  Capitol according to Gateway."  Is that right?

1   A.   Yes.

2   Q.   So then the moniker or call sign *HydroAlStatePOC*

3   then responds, "That is correct;" is that right?

4   A.   That is correct.

5   Q.   And are you aware of who utilized the moniker

6   *HydroAlStatePOC*?

7   A.   I am.

8   Q.   Who is that?

9   A.   It was Joshua James, The Alabama state point of

10   contact.

11   Q.   Another participant then, two rows down, sends a

12   link to a YouTube video, and at least according to the

13   link title, it was a live stream of patriots storming

14   the Capitol; is that correct?

15   A.   Yes.

16   Q.   And then someone else writes, "Are they actually

17   patriots, not those who are going to go in disguised as

18   patriots and cause trouble?  Need to verify this."  Is

19   that what was sent next?

20   A.   Yes, that was sent next.

21   Q.   Did the defendant then respond towards the bottom

22   of what we see here?

23   A.   Towards the bottom he responded.

24   Q.   What did he say?

25   A.   January 6th at approximately 2:01 p.m. Eastern, the

 1  defendant said, "Actual patriots, pissed off patriots."

 2  Q.   What does he say next?

 3  A.   20 seconds later, "Like the sons of Liberty were

 4  pissed off patriots."

 5  Q.   Does co-defendant Joshua James then respond?

 6  A.   He does.

 7  Q.   What does he say?

 8  A.   Mr. James, about two and a half minutes later,

 9  says, "We're coming to the Capitol, ETA" -- I'm sorry,

10  "We're coming to Capitol, ETA 30 minutes."

11  Q.   Does defendant Rhodes tell Mr. James not to come?

12  A.   No, not to our knowledge.

13          MS. RAKOCZY:  You can remove that exhibit from

14  the screen.

15  BY MS. RAKOCZY:

16  Q.   Did the defendant also exchange messages with

17  co-defendant Kelly Meggs around this time?

18  A.   He did.

19          MS. RAKOCZY:  With the Court's permission, we

20  would like to move into evidence and publish

21  Government's Exhibit No. 5.

22          MR. LINDER:  No objection.

23          THE COURT:  All right, it's admitted and you

24  may publish.

25          MS. RAKOCZY:  Thank you, Your Honor.

1  BY MS. RAKOCZY:

2  Q.   Special Agent Palian, I've brought up on the screen

3  Government's Exhibit No. 5.  Do you recognize these

4  messages?

5  A.   I do.

6  Q.   And were these also recovered from either

7  Mr. Rhodes' phone or Mr. Kelly Meggs' phone?

8  A.   Yes, they were.

9  Q.   Was defendant Kelly Meggs' phone also searched

10  pursuant to a warrant?

11  A.   It was.

12  Q.   These are in a slightly different format than the

13  other messages.  Is this another way that the data

14  looks when you review it from a cell phone extraction?

15  A.   Yes.

16  Q.   Special Agent Palian, if you could focus on the two

17  bottom messages in this exchange.  Are they messages

18  from Defendant Rhodes to Defendant Kelly Meggs?

19  A.   Yes, they are.

20  Q.   And from roughly when?

21  A.   These messages were sent Jan 6 at about 2:24 p.m.

22  Eastern.

23  Q.   And what did Mr. Rhodes tell Kelly Meggs?

24  A.   Mr. Rhodes said, "Go to south (emphasized) side of

25  U.S. Capitol."

34

1   Q.   And what did he say next?

2   A.   "That's where I am going to link up with redacted."

3   Q.   And are you aware of what's underneath that

4   redaction?

5   A.   Yes.

6   Q.   Without giving a name, what was the position of the

7   person who Mr. Rhodes said he was going to meet up with?

8   A.   That was the operations leader.

9        MS. RAKOCZY:   We can take that off the screen

10  now.   Thank you.

11  BY MS. RAKOCZY:

12  Q.   Special Agent Palian, are you aware of what Kelly

13  Meggs did after receiving that message from defendant

14  Rhodes?

15  A.   Yeah.   Mr. Meggs turned his group.   They were on

16  the north side of the Capitol around when that was sent

17  and they turned their group and headed southbound on

18  the east side of the Capitol at that point.

19  Q.   At around 2:30 p.m. then did Kelly Meggs and his

20  group pause on the east front plaza in front of the

21  Capitol building?

22  A.   They did, they paused for several minutes.

23  Q.   And at around 2:32 p.m. did defendant Kelly Meggs

24  call defendant Rhodes?

25  A.   He did.

1  Q.   And have you looked at the cell phone records for

2  that phone call?

3  A.   I have.

4  Q.   Does it appear from the cell phone records that the

5  call connected?

6  A.   It did.

7  Q.   Was Mr. Rhodes -- could you tell whether Mr. Rhodes

8  was on any other calls at that time?

9  A.   Yeah, Mr. Rhodes was on a call with the operations

10  leader at that point.

11  Q.   And based on what the records seem to show, what

12  did Mr. Rhodes then do with the Kelly Meggs incoming

13  phone call?

14  A.   The records indicate that there was a three-way

15  call that was initiated at that point.

16  Q.   Did that call last about a minute, minute and a

17  half?

18  A.   Approximately.

19  Q.   After that phone call, what did defendant Kelly

20  Meggs do next?

21  A.   After that phone call, Mr. Meggs took the Stack 1

22  and they went up the east side steps and entered the

23  Capitol.

24  Q.   And about when did they breach the building?

25  A.   About 2:40 p.m.

1    MS. RAKOCZY:  With the Court's permission,
2  we'd like to move into evidence and publish
3  Government's Exhibit 6.
4    THE COURT:  It looks like 6, 7 and 8 are
5  photographs.  Any objection to those exhibits?
6    MR. LINDER:  No, Your Honor.
7    THE COURT:  All right.  Government's Exhibits
8  6, 7 and 8 are admitted and you may publish those.
9    MS. RAKOCZY:  Thank you, Your Honor.
10  BY MS. RAKOCZY:
11  Q.  Showing you now Government's Exhibit No. 6, Special
12  Agent Palian, do you recognize these two photographs?
13  A.  Yes, I do.
14  Q.  With respect to the photograph on the left, can you
15  tell us what that shows?
16  A.  The photograph on the left shows Stack 1 in their
17  formation, with hands on each others' shoulders, going
18  up the east side Capitol stairs.
19  Q.  And did this occur around that, say, 2:34 or 2:35
20  time frame after Mr. Meggs had that phone call with
21  Mr. Rhodes?
22  A.  It took the Stack about five minutes to go up the
23  stairs -- five, six minutes.  So, yes, that was about
24  that time right after the phone call.
25  Q.  Special Agent Palian, with respect to the

1  photograph on the right, can you describe for the Court

2  what that shows?

3  A.   The right shows the interior of the Capitol just

4  before the rotunda, and this is the defendants after

5  they breached and they were inside the Capitol, the

6  Capitol structure.

7  Q.   There are little circles drawn around certain

8  individuals' heads and then boxes that give names

9  pointing to those circles.  Can you explain that for

10  the Court?

11  A.   Sure.  We were able to identify each of the members

12  of the Stack, where they were, and where they were

13  within the rotunda.  We circled it and put it on the --

14  Q.   And is this photograph on the right of Government's

15  Exhibit No. 6 a fair and accurate depiction, based on

16  your investigation of who these individuals were?

17  A.   Yes, it's fair and accurate.

18  Q.   And this photograph that we're seeing, Government's

19  Exhibit No. 6 on the right, does this show the members

20  of Stack 1 just after they breached the Capitol doors?

21  A.   I'm sorry, could you repeat the question?

22  Q.   Does this photograph on the right show the members

23  of Stack 1 right after they've breached the Capitol

24  doors?

25  A.   Yes, it shows them right after they breached.

1  Q.   Okay.

2        MS. RAKOCZY:   You can take that photograph off

3  the screen.

4  BY MS. RAKOCZY:

5  Q.   You mentioned a moment ago, Special Agent Palian --

6  we discussed the message where defendant James said on

7  a message that he and his group were headed to the

8  Capitol, ETA 30 minutes.  Do you recall that message?

9  A.   I do.

10 Q.   During the course of your investigation, did you

11 learn whether defendant James and other members of his

12 group did, in fact, go to the Capitol grounds?

13 A.   They did, in fact, go to the Capitol grounds, yes.

14 Q.   And did they then ultimately breach the building?

15 A.   They did.

16 Q.   Roughly when?

17 A.   Approximately 3:14, 3:15 p.m.

18 Q.   If we could bring up onto the screen now

19 Government's Exhibit No. 7, do you recognize these two

20 photographs?

21 A.   Yes, I do.

22 Q.   With respect to the photograph on the left, what

23 does that show?

24 A.   That shows members of Stack 2, including

25 Mr. Walden, Mr. Minuta, Mr. James, entering through the

1  east side doors.

2  Q.   Are those the same doors that Stack 1 breached?

3  A.   It is.

4  Q.   And then with respect to the photograph on the

5  right, does that show two other members of Stack 2

6  entering through the same doors about seven minutes

7  later?

8  A.   Yes, that photograph shows that.

9        MS. RAKOCZY:   I think you can take that

10  photograph off of the screen.

11  BY MS. RAKOCZY:

12  Q.   Special Agent Palian, after Stack 1 and Stack 2

13  left the Capitol building, what did they do?

14  A.   After Stack 1 and Stack 2 left the building, they

15  met up together with Mr. Rhodes outside the Capitol.

16  Q.   I'm showing you now -- we'll bring up on the screen

17  what's been marked as Government's Exhibit No. 8.   Do

18  you recognize this photograph?

19  A.   Yes, I do.

20  Q.   And can you tell the Court what this shows?

21  A.   Sure.   This is the photograph of Stack 1 and

22  Stack 2 outside the Capitol meeting up with Mr. Rhodes.

23  Q.   Where on the Capitol grounds are they, roughly?   Or

24  let me ask you this:   Are they in that sort of east

25  plaza --

40

1  A.   Yeah.  Yes, they are.

2  Q.   Do you see Mr. Rhodes in this photograph?

3  A.   I do.

4  Q.   Could you describe for the Court where he is?

5  A.   Sure.  Mr. Rhodes is almost dead in the middle of

6  the photograph.  It's hard to see, but he's wearing a

7  cowboy hat.  If you look at the largest American flag

8  at the top of the photograph and go directly down from

9  that --

10  Q.   Special Agent Palian --

11  A.   -- from the tip, he's there.

12  Q.   I'm sorry for interrupting you.  I think you're

13  going to have to put your finger on the screen and

14  circle.  Thank you.

15       MS. RAKOCZY:  And may the record reflect the

16  witness has drawn a blue circle around the area where

17  the defendant is.

18       THE COURT:  I can't tell that it is

19  Mr. Rhodes, but according to his testimony, yes.

20       MS. RAKOCZY:  Thank you, Your Honor.

21       THE WITNESS:  From that day, we have other

22  photographs of him wearing the cowboy hat and the dark

23  greenish jacket.

24       MS. RAKOCZY:  Thank you.  We can take that off

25  the screen.

1  BY MS. RAKOCZY:

2  Q.   And Special Agent Palian, I think to remove the

3  circle, you have to click that off the top.   Thank you.

4           Special Agent Palian, what was -- if you know,

5  what was the Quick Reaction Force doing at this time?

6  A.   Quick Reaction Force was stationed in Arlington at

7  the Comfort Inn in Ballston.

8  Q.   Did any members of the Quick Reaction Force send

9  messages to any of the group chats saying anything

10  relevant to what they were doing?

11  A.   Yeah.  At approximately 2:38, which was between the

12  phone call between Kelly Meggs and Mr. Rhodes, and

13  between the time when they breached the Capitol,

14  Mr. Vallejo sent a message to the group.

15  Q.   And roughly, what did he say?

16  A.   Approximately, it was "QRF standing by.  Just say

17  the word."  And that was about two minutes before

18  Stack 1 entered.

19  Q.   Special Agent Palian, during the late afternoon and

20  evening of January 6th, did the defendant make any

21  comments on these group Signal chats about what had

22  occurred at the Capitol that day?

23  A.   He did.

24  Q.   And what generally did he say?

25  A.   Generally, it was likened to the American

1  Revolution.  It was also approving, and it talked about

2  pissed off patriots.  And I remember one specific

3  message where the defendant said that they would now

4  walk the same path as the founding fathers.

5  Q.   Special Agent Palian, are you aware of when and

6  under what circumstances the defendant left the

7  Washington, DC area after the attack on the Capitol?

8  A.   Yes, I am.

9  Q.   Could you tell the Court about that?

10  A.   Sure.  After the events at the Capitol, certain

11  members of the group went to the Olive Garden for

12  dinner.  They stayed for dinner, during which time one

13  of the members of the group received a message from

14  someone in their "Intel Team," who said that federal

15  authorities were arresting patriots and that it was

16  time to leave.  So Mr. Rhodes -- so they left the Olive

17  Garden at that point.

18  Q.   And based on your investigation, did Mr. Rhodes

19  then leave the area?

20  A.   He did.  They went back to the Hilton, got their

21  effects, met up at a gas station, and then from there

22  left the DC area.

23  Q.   After January 6th, did the defendant continue to

24  take steps to encourage his co-conspirators to oppose

25  the lawful transfer of Presidential power?

43

1   A.   He did.

2   Q.   Did he send messages to some of these group chats

3   encouraging people to continue to take such steps?

4   A.   He did.

5   Q.   Are you aware of a message that he sent on January

6   11th of 2021 where he told his co-conspirators words to

7   the effect of "Get ready to rock and roll, shit's about

8   to go down"?

9   A.   Yes.

10  Q.   Did he also, in that same message, tell

11  co=conspirators that those in this community who were

12  fit enough to move, shoot, and communicate should be

13  organized and prepared to do so?

14  A.   Yes.

15  Q.   Did the defendant call some of his co-conspirators

16  to join him in Texas where he was residing at that time?

17  A.   He did.

18  Q.   Can you describe that for the Court?

19  A.   Sure.   There were Signal messages that went back

20  and forth.   The Florida team was asked to come out.

21  Their response was Florida is not -- "We're not leaving

22  the state of Florida until the first shot is fired."

23  The co-conspirators from Arizona actually came to

24  Texas, but didn't end up meeting with Mr. Rhodes for

25  some reason.   I'm sure there were several groups that

44

1    came to Texas, including Mr. James who went with

2    Mr. Rhodes to Texas.

3    Q.   Did defendant Joshua James send a message to

4    another co-conspirator in which he told that

5    co-conspirator he was bringing "all available firearms"

6    to join Mr. Rhodes in Texas?

7    A.   Yes, he did.

8    Q.   Did Mr. Rhodes continue to make purchases of

9    firearms, firearms parts, and related equipment after

10   January 6th --

11   A.   He did.

12   Q.   -- and before January 20th?

13   A.   Pardon me, I'm sorry, I didn't mean to interrupt

14   you.  He did.

15   Q.   Can you describe for the Court the amount of money

16   that you saw in the financial records being spent on

17   firearms and related equipment?

18   A.   Sure.  After January 6th, finishing out the month

19   of January, it was over $15,000, closer to $17,000, we

20   think.

21   Q.   After the inauguration, after January 20th of 2021,

22   in the months since, has the defendant continued to

23   refer to the current Presidential Administration as an

24   illegitimate regime?

25   A.   Yes.

1   Q.   Has he encouraged opposition to that regime amongst

2   his followers?

3   A.   He has.

4   Q.   Special Agent Palian, are you aware of whether the

5   defendant has a permanent address currently?

6   A.   I'm not aware of a permanent address.

7   Q.   Did the defendant previously have a permanent

8   address in the state of Montana?

9   A.   Yes.

10  Q.   And are you aware of him leaving that permanent

11  address in the middle of 2020?

12  A.   Approximately, yes.

13  Q.   And then during the latter part of 2020 and most of

14  2021, was the defendant primarily residing in Texas?

15  A.   Yes.

16  Q.   At the time of his arrest, had he -- was he still

17  residing in Texas, but at a different associate's

18  residence?

19  A.   Yes, he was.

20  Q.   And was he somewhat a guest at that residence?

21  A.   That's our understanding, yes.

22  Q.   Where does the defendant have important mail like

23  bank statements sent?

24  A.   Those are sent to a P.O. Box.

25  Q.   Does the defendant also maintain storage units,

1   based on your investigation?

2   A.   He does.

3   Q.   When the defendant was arrested, was his vehicle

4   searched pursuant to a warrant?

5   A.   His vehicle was searched, yes.

6   Q.   And in that vehicle did law enforcement recover a

7   receipt for a storage unit?

8   A.   Yes, we did recover that.

9   Q.   Was that storage unit also searched pursuant to a

10  warrant?

11  A.   It was.

12  Q.   Were there firearms and firearms related equipment

13  located in that storage unit?

14  A.   Yes.

15  Q.   At the time of his arrest, was the room in which

16  the defendant was staying searched pursuant to a

17  warrant?

18  A.   It was.

19  Q.   And were there also firearms and firearms related

20  parts recovered from that room?

21  A.   Yes.

22  Q.   Special Agent Palian, you've discussed how you

23  searched the defendant's phone pursuant to a search

24  warrant; is that right?

25  A.   That's correct.

1   Q.   In searching that phone, did law enforcement see

2   evidence that certain Signal messages had been deleted

3   from the phone?

4   A.   Yes, we did see that evidence.

5   Q.   And were some of these deleted messages on some of

6   the planning and coordination Signal chats that we've

7   discussed?

8   A.   Yes.

9   Q.   And were these apparently deleted messages from

10  time frames relevant to the conspiracy, that is,

11  November of 2020 through January of 2021?

12  A.   Yeah, they were from that time frame.

13  Q.   Are you an expert in forensically examining

14  cellular telephones?

15  A.   I am not.

16  Q.   Did you speak with forensic analysts from the FBI

17  about what you had been seeing in the phone?

18  A.   Yes, we did.

19  Q.   Based on what you were seeing in the phone, did the

20  FBI Analyst have a sense or a conclusion about whether

21  those messages were deleted by the user of the phone or

22  by someone else?

23  A.   Yeah, the conclusion was that they were deleted by

24  the user of the phone, Mr. Rhodes.

25  Q.   Have you found evidence during your investigation

1  that the defendant was mindful of the fact that law

2  enforcement might look to those Signal messages as

3  evidence in this case?

4  A.   Yes, we developed some evidence of that.

5  Q.   Could you describe that for the Court?

6  A.   Mr. Rhodes engaged in some text messages with

7  Mr. Vallejo after the fact, where he informed

8  Mr. Vallejo to be careful speaking on Signal because

9  the FBI had Jessica Watkins' phone and was probably

10 looking in it, and that he was aware of -- I forget the

11 specific term, but it was a pejorative term for an FBI

12 informant.  He was aware that one of them was in the

13 messages.

14 Q.   Special Agent Palian -- and that was Mr. Rhodes who

15 was hypothesizing; is that right?

16 A.   Yes.

17 Q.   Special Agent Palian, were these messages that

18 you've just described sent in late January of 2021?

19 A.   Yes.

20 Q.   Was that after co-defendant Jessica Watkins was

21 arrested?

22 A.   Correct.

23 Q.   When, roughly, was co-defendant Watkins arrested?

24 A.   Ms. Watkins, we believe, was arrested, if my memory

25 serves, January 17th late in the evening.

```
 1            MS. RAKOCZY:  Thank you, Your Honor.  No
 2  further questions.
 3            THE COURT:  All right.  Cross-examination.
 4            MR. LINDER:  One second, Your Honor.
 5                      CROSS-EXAMINATION
 6  BY MR. LINDER:
 7       (Counsel's microphone off during questioning)
 8  Q.   Good morning, Agent.  How are you?
 9  A.   Good morning, sir.
10  Q.   Good.  The -- let me go a little bit into your
11  direct examination first.  All the firearms were found
12  either in a storage unit or in a car or wherever he was
13  staying at; correct?
14  A.   Yes, that's right.
15  Q.   It's not illegal to own a firearm in Texas, is it?
16  A.   It is not, no.
17  Q.   There were no illegal firearms found, i.e., machine
18  guns or anything like that; correct?
19  A.   Not to my knowledge.
20  Q.   The guns that you found, did you determine later
21  that they were all legally purchased from various
22  places?
23  A.   I don't know that we went back and found out where
24  those weapons were purchased, but I will say that we
25  have no information that says they were illegally
```

1   purchased.

2   Q.   And no serial numbers filed off, nothing like that?

3   A.   Not to my knowledge.

4   Q.   So there wasn't anything done by my client,

5   Mr. Rhodes, to conceal the fact that he owned firearms

6   or purchased firearms?

7   A.   No, there was no concealment.

8   Q.   And do understand at the Montana address he was

9   married and had six children that still live in

10  Montana; do you understand that?

11  A.   Yes.

12  Q.   Since early 2020, just before COVID, it's our

13  understanding he's lived in Granbury, Texas.  Is that

14  kind of consistent with what you have?

15  A.   That's my understanding, too.

16  Q.   In fact, his current driver's license still shows

17  that address?

18  A.   I believe that's correct.

19  Q.   And the P.O. Box you referred to that Oath Keepers

20  gets their mail in, that is also in Granbury, Texas

21  near that address?

22  A.   Yes, it is.

23  Q.   Is the storage unit also there?

24  A.   The storage unit is in Granbury.  I'm not sure

25  where in Granbury.

1   Q.   Granbury is a small town; would you agree with me?

2   A.   It is.  I've never been there.

3   Q.   Okay, just south of Fort Worth.  He's got a

4   driver's license and address there, P.O. box there, and

5   a storage unit; correct?

6   A.   Yes.

7   Q.   Okay.  And for all practical purposes, he's been

8   there for almost two years?

9   A.   If we're considering the middle of 2020 to now,

10   yeah.

11   Q.   Okay.

12   A.   I guess that would be fair.

13   Q.   Okay.  Now, this conduct that we've talked about

14   that happened on January 6th leading into that.

15   A.   Sure.

16   Q.   You showed the pictures of them in the Capitol,

17   circles around those guys.  There's mobs of people

18   there that day?

19   A.   There were mobs of people.

20   Q.   In fact, y'all indicted approximately 800 people so

21   far and probably more coming; would you agree?

22   A.   I'm not sure of the exact number, but it's large.

23   It's around that.

24   Q.   Hundreds?

25   A.   It's hundreds, for sure.

1  Q.   And these people aren't all Oath Keepers, are they?

2  A.   No.

3  Q.   It's all different groups, independent people, just

4  people trying to make a statement?

5  A.   I don't know if I'd go as far as saying just trying

6  to make a statement, but yes.  I mean, there are

7  large --

8  Q.   There's a real estate lady from Texas who videoed

9  herself in the rotunda.  I mean, she's just there;

10 correct?

11 A.   Sure.  Yeah, I mean, I'm not familiar with those

12 cases as much, but yes.

13 Q.   But the Oath Keepers were not the first people that

14 broke down the doors or breached the doors or anything

15 like that; were they?

16 A.   They were not the first ones in the Capitol, no.

17 Q.   They were just kinda in the mob, or some of them

18 were just in the mob; is that right?

19 A.   They were part of the mob, yes.  I don't mean to

20 quibble words with you, by the way, either.  I'm not

21 trying to be.

22 Q.   I'm not trying to trick you with any questions.  I

23 just wanted to make sure the judge understood they

24 weren't the ones who physically breached the doors or

25 breached the gates; they were just there with the other

1  people that did it?

2  A.   They were there with the mob, yes.

3  Q.   Yes.  And there were other people that actually did

4  that before they got there?

5  A.   Uh-huh

6  Q.   Now, all this happens January 6th, y'all do your

7  investigation.  And so the judge is aware, there was

8  the initial Indictment, the Caldwell Indictment?

9  A.   Yes.

10  Q.   And that happened two weeks after this incident, I

11  think, and there's 17 defendants on that Indictment.

12          MR. LINDER:  And I believe I've given counsel

13  for the Government a copy of that Indictment.

14          MS. RAKOCZY:  Yes, Your Honor, that's right.

15  A.   Just to be clear, though, sir, I think the -- and

16  correct me if I'm wrong on this.  I think the first

17  indictment, the Caldwell Indictment, which came down

18  Jan 19 or 20 only had three defendants on it.

19  BY MR. LINDER:

20  Q.   Okay.  But it's since been added to and there's 17

21  defendants on it?

22  A.   Yes, I think that's the number.

23  Q.   This new Indictment that just came down this month

24  with the new people, it's the same and similar conduct

25  that's discussed in the Caldwell Indictment all the way

54

1  back to January; right?  Would you agree with me?

2  A.   Yeah, the conduct is similar.

3  Q.   There's no -- other than the Government saying my

4  client obstructed justice by committing some instant

5  messaging potentially, there's no remaining conduct in

6  any of this after the January 20th stuff of the alleged

7  instant messaging going on about saying there's going

8  to be a civil war.

9        MS. RAKOCZY:  Objection, Your Honor, to having

10 this witness characterize the Indictment.

11       MR. LINDER:  Your Honor, the Indictment -- the

12 only allegation in the Indictment includes -- the only

13 manner and means in the Indictment after January was

14 the alleged instant messaging.

15       THE COURT:  Why don't you rephrase your

16 question, counsel.

17 BY MR. LINDER:

18 Q.   Are you aware of any new things that he's done

19 since January or February of last year, since he's been

20 indicted?

21 A.   We're aware of conduct, but I don't think that's

22 included in the --

23 Q.   Correct.  And the manner and means, very specific,

24 none of that's included in there?

25 A.   I don't believe so.  I mean, I'd like to refer to

1  the Indictment before I give a final answer on that.

2  But no, I think that's correct.

3  Q.   And would you agree with me that back in January

4  when y'all did this investigation and did the Caldwell

5  Indictment, you were aware of Stewart Rhodes at that

6  time, were you not?

7  A.   We were aware of him, but we were just beginning

8  the investigation at that point.  We didn't have a lot

9  of information on activity.

10  Q.   And he's cooperated, he's talked to you guys since

11  then, has he not.

12  A.   He has.

13  Q.   Okay.  The -- so that we're clear, there are 17 now

14  on the Caldwell Indictment and there are about 11 on

15  this new Indictment with all the same, substantially

16  similar conduct that led to the [U/I]?

17  A.   Substantially.

18  Q.   Okay.  So can you tell the Court, other than the

19  speech that my client made through instant messaging to

20  his followers or whoever else got the Government people

21  [U/I], can you tell us any illegal acts he's done since

22  January, a year ago, other than the speech you were

23  talking about?

24  A.   No, nothing is coming to me right now.

25  Q.   Okay.  So, other than the speech that we're talking

 1  about, most of the stuff that we're talking about here
 2  today that the Government has presented in this
 3  Detention Hearing occurred between November of '20 and
 4  January of 2021?
 5  A.   That's the time period of the Indictment and the
 6  conspiracy, yes.
 7  Q.   Thank you.  Now, since then, my client has met with
 8  you guys two times in May, I believe?
 9  A.   I participated in the one.  I'm not familiar with
10  the other one in May.
11  Q.   The one you participated in was May 3rd?
12  A.   It was early May.  It was early May in Lubbock.
13  Q.   Okay.  And that's when y'all retrieved his phone?
14  A.   Yes.
15  Q.   And when you approached him, did you bring another
16  FBI Agent with you from Montana to that meeting?
17  A.   Yes, I did.
18  Q.   And which agent was that?
19  A.   That was Special Agent Mark Saylor.
20  Q.   And why did you bring Mark Saylor?
21  A.   Mark had met Mr. Rhodes before and had spoken to
22  him several times over the phone.
23  Q.   They actually had a friendly relationship?
24  A.   They had a friendly relationship over the phone --
25  I mean cordial.  I don't know if I'd say friendly, but

1   cordial.

2   Q.   They didn't get together, but they did call each

3   other.

4   A.   Right, they would speak over the phone.

5   Q.   And that goes back to 2014?

6   A.   I'm not sure of the specific date, but that sounds

7   right.  I know it went back awhile.

8   Q.   Sure.  And so that's why y'all called him and said,

9   hey, we're going to do a meeting with Mr. Rhodes and

10  we'd like you to be there, and he came to this meeting?

11  A.   Yes.

12  Q.   And Mr. Rhodes -- when y'all approached Mr. Rhodes,

13  was he friendly?

14  A.   He was.

15  Q.   Was he armed?

16  A.   I believe he was, but he informed us of that and

17  the firearm was in his backpack.  I don't think it was

18  on his person.

19  Q.   And this was in Texas and he was legally carrying

20  his gun at the time?

21  A.   I believe so.

22  Q.   He informed you and y'all didn't do a patdown

23  search or anything?

24  A.   No, we did not.

25  Q.   Okay.  And did he voluntarily hand over the phone?

1  A.   We had a search warrant, but he physically handed

2  me the phone.

3  Q.   Didn't try to run from you?

4  A.   No.

5  Q.   Didn't try to fight you, gave you the phone?

6  A.   Correct.

7  Q.   And did he also give you the passcode to log into

8  the phone?

9  A.   He did provide us with the passcode, yes.

10  Q.   And he didn't have to do that pursuant to the

11  search warrant, he just had to provide you the phone?

12  A.   He had to provide us biometrics and the phone, but

13  he did not have to provide us the passcode.

14  Q.   But he did?

15  A.   He did.

16  Q.   And that simplified the investigation of the phone,

17  the download of the phone?

18  A.   It did.

19  Q.   It could take months to do it without the code;

20  correct?

21  A.   With biometrics it's much quicker, but yes, it

22  would have slowed us down; that's a fair statement.

23  Q.   In fact, y'all returned his phone two or three

24  weeks later.  You may not have been in that meeting --

25  A.   I was not.

59

1  Q.   -- but you were aware of it?

2  A.   Is that the second meeting you are talking about?

3  Q.   Yes.

4  A.   Yeah.  Yes, I was not a part of that.

5  Q.   Okay.  So the FBI met him again a few weeks later

6  and returned his phone?

7  A.   Right.

8  Q.   Have you reached out to him at any time since?

9  A.   The FBI has.  I have not.

10         MR. LINDER:  May I have a minute, Your Honor?

11         THE COURT:  Yes.

12         *[Pause]*

13  BY MR. LINDER:

14  Q.   Y'all met with him on May 3rd in Lubbock or

15  Amarillo -- Lubbock, Texas.  Y'all met with him for

16  two, two and a half hours?

17  A.   About, yes.

18  Q.   Have you seen the transcript of that interview?

19  A.   Yes, I have.

20  Q.   The Government has provided it to us.  I appreciate

21  it.  Are you aware or can you tell the Court that he

22  did tell you that if y'all are going to indict him, to

23  let him know and he would go to DC and turn himself in?

24  A.   I believe he said that.

25  Q.   And I can show it to you --

1  A.   If it's in the transcript, then yes, it happened.

2  I'm just not recalling it right now.

3  Q.   Okay.  And that was a very cordial conversation?

4  A.   It was.

5  Q.   And he said, "Hey, if you're going to indict me,

6  let me know and I'll go turn myself in"?

7  A.   Yes.

8  Q.   But y'all didn't let him turn himself in?

9  A.   No, we did not.

10 Q.   And in fact, this past week, I guess, when y'all

11 arrested him, did y'all call Agent Saylor back?

12 A.   No.

13 Q.   From Montana?

14 A.   No, we did not.

15 Q.   Did y'all let Saylor know that y'all were going to

16 arrest him?

17 A.   I think I had general conversations with Agent

18 Saylor prior, but I don't know if I gave a specific

19 date or an operation time.  I'm not positive about that.

20 Q.   Agent Moore, was he there?

21 A.   Yes, Agent Moore was there.

22 Q.   And did Agent Moore -- before y'all went in and

23 arrested him, when y'all went to Chad Roberts' house,

24 where he was, did Agent Moore call him on his phone and

25 say, "Hey, we're here to arrest you"?

1   A.   Yes, he did.

2   Q.   And he said, "I'm coming out"?

3   A.   Mr. Rhodes did say, "I'm coming out," yes.

4   Q.   He's cooperated with everything, hasn't he?

5   A.   He cooperated.

6   Q.   Yeah.

7   A.   Yeah.

8   Q.   Since January of last year, when most of this

9   offensive conduct was alleged to have happened, has my

10  client -- are you aware of my client obtaining a

11  passport?

12  A.   No, I'm not aware of that.

13  Q.   Are you aware of him changing his driver's license?

14  A.   No.

15  Q.   Are you aware of him obtaining a new residence

16  address?

17  A.   No.

18  Q.   Are you aware of him having any foreign contacts or

19  bank accounts in other countries?

20  A.   No.

21  Q.   In fact, are you aware of him ever traveling

22  outside the country?

23  A.   No.

24  Q.   When did you first become aware of Mr. Rhodes?  You

25  said it wasn't in January of last year.  When did you

```
 1  first --
 2  A.   It was middle January of 2020.
 3  Q.   Okay.
 4  A.   I don't know if I have a specific date.
 5  Q.   Okay.  And at that time you were aware of all this
 6  offense conduct that y'all testified to?
 7  A.   Yes.
 8  Q.   And you wouldn't say he's dangerous because all of
 9  this offense conduct that you testified to?
10          MS. RAKOCZY:  Objection.
11          THE COURT:  What's the objection?
12          MS. RAKOCZY:  Objection calls -- argumentative.
13          THE COURT:  Overruled.
14  BY MR. LINDER:
15  Q.   The purpose of this hearing -- I know you're aware,
16  this is not a guilt/innocence hearing, this is a
17  Detention Hearing, and the Government has got to show
18  that he's a danger.
19  A.   Right.
20  Q.   I believe the Government's purpose in all these
21  messages and the guns is to show that he's potentially
22  a danger, and the information you provided about the
23  address, that he might be a problem; am I correct?
24  A.   I would assume so.
25  Q.   So all of this dangerousness occurred, most of it,
```

1  between November 2020 and January of 2021, aside from

2  this speech stuff?

3  A.   Again, that's the time period of the Indictment,

4  yes.

5  Q.   And you knew about all of this behavior a year ago?

6  A.   A year ago, yes.

7  Q.   Yet you chose not to arrest him until a year later?

8  A.   Correct.  Well, I -- let me -- I guess I should --

9  the word "chosen," I guess, is -- I don't know if I

10 agree with the word "chosen."

11 Q.   I'll ask another question.  If he were a danger,

12 based on the conduct that you described today, he would

13 have been a danger January a year ago, wouldn't he?

14 A.   Correct.

15 Q.   You could have issued a complaint -- the Government

16 could have issued a complaint and had him arrested

17 within days?

18 A.   We could have issued that, yes.

19 Q.   But they chose not to?  And I know that's not your

20 job.

21 A.   Right, yes.  I see where you're going with

22 "chosen," yes.

23 Q.   So, if you think someone is dangerous, you could

24 issue a complaint in 24 hours?

25 A.   Right.  Yes, that's correct.

64

1  Q.   And since that time, there's really been no conduct

2  that's a danger that they've alleged or what happened

3  today, other than the language of instant messaging?

4  A.   That's the only conduct we've put out today, yes.

5        MR. LINDER:  One minute, Your Honor.

6  BY MR. LINDER:

7  Q.   I guess we can go back to the actual messaging.

8  When they're messaging each other around the Capitol,

9  there's a response to meet up, and James and some

10 others that say, "Hey, we're on our way, we'll be there

11 in 30 minutes"?

12 A.   Right.

13 Q.   Were they coming from a QRF?

14 A.   No, they were not coming from the QRF.

15 Q.   When they say they're coming, they're going to be

16 there in 30 minutes, did they bring weapons with them?

17 A.   They had some non-lethal weapons, but they didn't

18 have firearms.

19 Q.   Nothing that was illegal in DC?

20 A.   Correct.

21 Q.   In fact, they were following the laws of DC at that

22 time, were they not?

23 A.   Except for the traffic laws, yes.

24 Q.   Correct.  But the weapons, whether it was knives,

25 guns or whatever that in DC was illegal, they were all

 1  legally in a hotel, whatever, they didn't bring any of

 2  them into DC?

 3  A.   Right.

 4  Q.   There's no evidence that when all this was going on

 5  that they ever even brought any into the Capitol?

 6  A.   Could you ask that question again for me, sir?

 7  Q.   There's no evidence that they brought any weapon

 8  into the Capitol other than the non-lethal ones?

 9  A.   Into the Capitol, yes, that's correct.

10  Q.   And so they could have.  If they had all this stuff

11  out there 4.9 miles away by Google maps, they didn't do

12  that, did they?

13  A.   They did not.

14  Q.   Okay.  Are you familiar with LEOSA, the law to

15  carry weapons -- other officers being able to carry

16  weapons in certain places?

17  A.   Very, very vaguely.

18  Q.   Did y'all talk about it at that meeting that you

19  had on May 3rd?

20  A.   Yeah, I believe it was brought up.

21  Q.   Okay.  And did Mr. Rhodes appear very educated on,

22  hey, what we can bring and what we can't bring.  We

23  weren't going to break a law.  The law allows us to go

24  here, but not there, and y'all discussed it in that

25  interview?

1   A.   Yeah, those things were discussed.

2   Q.   And did it seem very apparent he did not want to

3   break the law?

4   A.   I mean, I wouldn't want to characterize his

5   mindset, but yes, he said those things.

6   Q.   And again, the FBI, when they wanted to call him,

7   they can call him, people that know his phone number,

8   and he responds, does he not?

9   A.   He always has.

10            MR. LINDER:  No further questions.

11            THE COURT:  All right, redirect?

12            MS. RAKOCZY:  Briefly, Your Honor.

13                    **REDIRECT EXAMINATION**

14  **BY MS. RAKOCZY:**

15  Q.   Special Agent Palian, did the defendant also send

16  messages on the Signal chat discussing the fact that if

17  people brought guns to the district, they were aware

18  that some law officers were stopping people and might

19  search them?

20  A.   Yes.

21  Q.   And had members of the QRF gone into the district

22  and had their weapons and been arrested, would they

23  have been able to continue serving as the QRF?

24  A.   No, they would not have been.

25  Q.   You were asked some questions about Stack 1 and

1  whether they breached the building, and you said that

2  they did not; is that right?  They were not the first

3  to -- I'm sorry, they were not the first to break the

4  doors open?

5  A.  Correct.

6  Q.  When Kelly Meggs with Stack 1 go up the stairs to

7  the area outside the doors to the building, were the

8  doors open at that time?

9  A.  No, they were not.

10  Q.  Have you watched some public source video about

11  what happened outside those doors around 2:38 p.m.?

12  A.  Yes.

13  Q.  Did the mob, with some help of rioters inside the

14  building, force the doors open?

15  A.  They did at about 90 seconds before Stack 1

16  entered, yes.

17  Q.  Was Stack 1 present in that mob a few rows back

18  from the door around that time?

19  A.  Yeah, they were 10 to 20 feet back.

20  Q.  Special Agent Palian, you were asked about

21  co-defendant Joshua James' group and how they told

22  Mr. Rhodes they were on their way to the Capitol at

23  around 2:00 p.m. and would be there in about 30

24  minutes.  Do you do you recall that questioning?

25  A.  Yes.

1  Q.  Have you obtained during the course of your

2  investigation a video that an individual with

3  Mr. James, co-defendant Roberto Minuta, made as the

4  group went to the Capitol?

5  A.  Yes.

6  Q.  And during that travel to the Capitol, did

7  Mr. Minuta state that there's war on the streets right

8  now?

9  A.  Yes.

10  Q.  Did he say that they were on their way to the

11  Capitol?

12  A.  Yes.

13  Q.  Special Agent Palian, you were asked some questions

14  about whether you could have arrested Defendant Rhodes

15  last January.  Do you recall those questions?

16  A.  Yes, I do.

17  Q.  As of last January, had you obtained a search

18  warrant for Defendant Rhodes' phone?

19  A.  No, we did not have a search warrant in January.

20  Q.  After you obtained that search warrant, did that

21  phone have to go through an extensive filter process to

22  review and take out any [U/I] messages, that the

23  investigation and trial team did not see those messages?

24  A.  It did.

25  Q.  Have you recovered a number of significant messages

1   with respect to the defendant's mental state and

2   culpability in this case from that phone?

3   A.   Yes.

4   Q.   Have you recovered other aspects of evidence

5   against Mr. Rhodes during the course of this

6   investigation in the months since January of 2021?

7   A.   Yes.

8   Q.   And did those form the allegations in the

9   Indictment in this case?

10  A.   They do.   They have.

11  Q.   Special Agent Palian, you were asked some questions

12  about the weapons that those Oath Keeper members and

13  affiliates who breached the Capitol brought into the

14  building.   You were aware that there were some

15  non-lethal weapons on those individuals' persons;

16  correct?

17  A.   There were.

18  Q.   At least one or two brought pepper spray or bear

19  spray; is that right?

20  A.   Yes.

21  Q.   And at least one member carried a large stick into

22  the building; is that right?

23  A.   Yes.

24  Q.   Were all of those or most of those members also

25  wearing military style protective gear?

1    A.   Yes.

2    Q.   Did that include helmets?

3    A.   Hard knuckle gloves, helmets, goggles.

4    Q.   And did some -- did at least one member, an

5    affiliate -- did Defendant Joshua -- have you seen

6    video of Defendant Joshua James assaulting at least one

7    member of law enforcement in the rotunda area of the

8    Capitol?

9    A.   Yes.

10         MS. RAKOCZY:  Thank you, Your Honor.  I have

11   no further questions.

12         THE COURT:  Any other questions, Mr. Linder?

13         MR. LINDER:  Just briefly.

14                    **RECROSS-EXAMINATION**

15   **BY MR. LINDER:**

16     **(Counsel's microphone off during questioning)**

17   Q.   Agent, in regards to Joshua James, which counsel

18   has talked about assaulting a law enforcement officer.

19   A.   Yes, sir.

20   Q.   He's actually on release, is he not?

21   A.   Mr. James is out on release, yes.

22   Q.   Okay.  And in fact, Roberto Minuta, who went into

23   the Capitol, is also on release?

24   A.   He is.

25   Q.   Donovan Crowl, who went into the Capitol, is on

1  release?

2  A.   Yes.

3  Q.   And my client never went in the Capitol, did he?

4  A.   Your client never went into the Capitol.

5  Q.   And you said there were some Oath Keepers in that

6  crowd behind the doors that got breached.  They weren't

7  coordinating that breach with the mob, were they?  They

8  were in that crowd behind the front people, but they

9  weren't the ones that coordinated it, were they?

10  A.   No, that's correct.

11  Q.   It was other people that coordinated it?

12  A.   Yes.  I'm sorry, I wasn't clear.

13  Q.   They were in kind of -- some of them were in a

14  group behind?

15  A.   Yes.

16  Q.   Thank you.

17                 **EXAMINATION BY THE COURT**

18  Q.   Special Agent, I have a few questions for you.

19          The Government is moving to detain on several

20  different bases.  One is a serious risk of flight.

21  What evidence do you have that Mr. Rhodes is a risk of

22  flight?

23  A.   Isn't a risk of flight?

24  Q.   Is.

25  A.   Oh, is a risk of flight.  Mr. Rhodes doesn't seem

1  to -- he's seems to be very mobile, he seems to only
2  have limited personal effects, which would allow him to
3  move quickly from an area.  He doesn't seem to have
4  ties to a lot of areas, other than what I discussed.
5  Q.   But he's been here for almost two years, correct,
6  in Texas?
7  A.   Yeah, to my knowledge, he's been in Texas for about
8  two years, yes.
9  Q.   Okay.  Anything else?
10 A.   No, I can't think of anything else.
11 Q.   The Government is also moving -- alleging a risk of
12 obstruction of evidence.
13 A.   Yes.
14 Q.   I wanted to make sure I'm clear, the deleting of
15 messages, what time frame did that occur?
16 A.   We can't tell when the messages themselves were
17 deleted, but the messaging were from the pertinent time
18 period.  But our forensics can't determine when the
19 message was deleted.
20 Q.   Okay.  In addition to the deletion of messages, is
21 there any other evidence of attempts to obstruct
22 justice by Mr. Rhodes?
23 A.   The deletion of the messages is what's coming to
24 mind right now.
25 Q.   And do you know, was that on one -- was that on one

1  certain date or was it a continued pattern of deleting

2  messages?

3  A.   I'm not sure.

4  Q.   You don't know?

5  A.   I'm not sure.

6  Q.   And that happened shortly after the January 6th --

7  A.   We don't know.  I can't say a time frame.  It

8  happened between January 6th and when  we recovered the

9  phone, which was May.

10  Q.   Since the January 6th event, have -- you testified

11  regarding --

12  A.   Oh, ma'am, I'm sorry, can I --

13  Q.   Yeah.

14  A.   One other thing.  We are aware of individuals close

15  to Mr. Rhodes saying, per Stewart Rhodes, delete all

16  your evidence, delete all your messages.  We are aware

17  of that.

18  Q.   And that was shortly after the January 6th event?

19  A.   Yes.

20  Q.   You testified to conversations shortly after the

21  January 6th event that Mr. Rhodes had in chats of

22  various sorts about continuing the war or however he --

23  I'm paraphrasing.  But has his phone been monitored?

24  Have you monitored his communications at all?  I don't

25  know what time frame.  I'm guessing that was sort in

1    the January/February months after the incident.

2    Throughout this last year, have you observed any

3    communications?

4    A.   So our -- we seized the phone in May.  That's when

5    the communications with Mr. Rhodes -- that's our time

6    frame that we have communications from him is up to May

7    for the most part.

8         We also have public statements that he's made

9    during that time period which referred to the incoming

10   administration as a foreign and illegal occupying force

11   or an enemy occupying force.  Those are public

12   statements that he made in various forms.

13   Q.   So no communications have been monitored since May

14   of 2021?

15   A.   Do you mean like a Title III or something?

16   Q.   Uh-huh.

17   A.   No.

18        THE COURT:  All right, thank you.  You may

19   step down.

20        Does the Government have any other

21   witnesses?

22        MS. RAKOCZY:  No, Your Honor.

23        THE COURT:  Mr. Linder?

24        MR. LINDER:  Your Honor, do you want to hear --

25   the only witness I was going to call is my third party

 1  custodian.  I've got family here that I would just
 2  proffer, and a friend, but I didn't want to hold them
 3  all to the stand.
 4          THE COURT:  Well, I've read the letters that --
 5  I'm assuming you're going to offer those into evidence
 6  at some point?
 7          MR. LINDER:  Yes, Your Honor.
 8          THE COURT:  But I had some time and I went
 9  ahead and read them before the hearing.  I don't think
10  it's necessary to have any character evidence from
11  family, but I would like to hear from your proffered
12  third party custodian.
13          MR. LINDER:  I did provide those letters to
14  counsel for the Government.
15          MS. RAKOCZY:  Yes, Your Honor.
16          THE COURT:  All right, sir, you will need to
17  come up to the witness stand, please.
18          COURTROOM DEPUTY:  If you'd please raise your
19  right hand.  Do you solemnly swear the testimony you
20  are about to give in the case before the Court shall be
21  the truth, the whole truth, and nothing but the truth,
22  so help you God?
23          THE WITNESS:  Yes.
24          COURTROOM DEPUTY:  Have a seat, please, and if
25  you could state your name and spell it for the record.

```
 1              THE WITNESS:  I'm Brian, B-r-i-a-n.

 2              COURTROOM DEPUTY:  And your last name?

 3              THE WITNESS:  Bodine, B-o-d-i-n-e.

 4              COURTROOM DEPUTY:  B-o-d-i-n-e.

 5              THE COURT:  You may proceed, Mr. Linder.

 6              MR. LINDER:  Your Honor, I would like to keep

 7    out some of the biographical information due to the

 8    press that's in here.  I mean, he's a Dallas resident.

 9    I think Probation has his information.

10              THE COURT:  Okay.

11              BRIAN BODINE, CALLED BY THE DEFENSE

12                    DIRECT EXAMINATION

13    BY MR. LINDER:

14    Q.   Brian, how long have you known Mr. Rhodes?

15    A.   Since about late March, early April 2020.

16    Q.   You've known him almost two years?

17    A.   Yeah.

18    Q.   And are you a member of Oath Keepers?

19    A.   No.

20    Q.   Do you live here in the Dallas County area?

21    A.   Yes.

22    Q.   And do you have any criminal history?

23    A.   No.

24    Q.   The address that you've given to Probation, is that

25    an address that he can live at with you?
```

```
 1  A.   Yes.
 2  Q.   Are there any weapons in that home?
 3  A.   No.
 4  Q.   Do you have any alcohol or drug issues?
 5  A.   No.
 6  Q.   Do you have a job?
 7  A.   Yes.
 8  Q.   Have I explained to you what the duties of a third
 9  party custodian are?
10  A.   Yes.
11  Q.   If the judge releases him, I would anticipate he
12  will be on some kind of GPS monitor.  And that you
13  would be required to be informed of the Court date, the
14  meetings he has, and to make sure he got there, but
15  also to inform the Court if you thought he was doing
16  anything illegal, if he was purchasing guns or around
17  other co-defendants he's not supposed to be around.
18  Could you promise the Court that you can do that?
19  A.   Yes.
20  Q.   And do you know Chad Roberts, the person whose
21  house he was at when he was arrested; is that correct?
22  A.   Yes, I do.
23  Q.   And is Chad also willing to be a third party
24  custodian, but he just can't live there because of his
25  children?
```

1    A.   He's told me that, yes.

2    Q.   So, between the two of you, acting as a third party

3    custodian, he's a lawyer and a Rabbi, they can go off

4    and communicate daily in regards to Mr. Rhodes; is that

5    correct?

6    A.   Correct.

7    Q.   And Mr. Rhodes had been living with him?

8    A.   Correct.

9    Q.   And you weren't there in DC on the 6th, were you?

10   A.   No.

11   Q.   You're not in any of these cases, are you?

12   A.   No.

13            MR. LINDER:  I'll pass the witness.

14            THE COURT:  Cross-examination?

15            MS. RAKOCZY:  No, Your Honor, thank you.

16            THE COURT:  All right.  I have some questions.

17                        **EXAMINATION**

18   **BY THE COURT:**

19   Q.   All right, sir, you said that you met Mr. Rhodes

20   late March, early April of 2020; correct?

21   A.   Yes, that's correct.

22   Q.   How did you meet him?

23   A.   He was in front of Shelley Luther's salon in North

24   Dallas and I can't remember the exact day, but it was

25   right in that time frame, shortly after the COVID

1  lockdown, shutdowns had started, and a group of people

2  gathered there just to see what was going on.

3  Q.   Was that a staged protest?

4  A.   I wouldn't say staged.  I would say that it was

5  just citizens that were concerned and she opened up her

6  business, as you may recall, and people went down there

7  to show support for her.  So it was a show of support.

8  Q.   Okay.  So at the show of support, that's how you

9  met Mr. Rhodes?

10 A.   Yes.

11 Q.   And tell me about your relationship since that day

12 that you met him.

13 A.   I mean, I met him, I shook his hand, I can't

14 remember the exact day it was.  And then, you know,

15 I've talked to him a number of times since then.  I've

16 hung out with him, played pool with him, watched

17 Cowboys games with him and other friends, you know.

18 It's just I've -- basically, he's a friend.

19 Q.   Okay.  How often would you say  that you see him?

20 A.   Shortly before Christmas, it was like a couple of

21 days before Christmas.  Again, the most recent time

22 would have been the last football game of the regular

23 season we watched Cowboys and Eagles.  So twice a

24 month, once a month, twice a month, three times a

25 month.  I mean, it just depends on the month here.

1  Q.   I know you testified you are not a member of the

2  Oath Keepers.

3  A.   Correct.

4  Q.   Do you follow the statements that he makes online

5  in that regard?

6  A.   I don't follow any feeds by the Oath Keepers

7  actively on anything.  In fact, I think that group has

8  been de-platformed.  So I don't follow that actively,

9  but I do follow the news -- everything  in the news.

10 Q.   You mentioned that you were also friends with Chad

11 Roberts.

12 A.   I know Chad, yes.

13 Q.   And how do you know him?

14 A.   Kind of the same way.  He was also there in front

15 of Shelley Luther's Salon around that time period and I

16 met him then and, you know, just struck up

17 conversations with him.

18 Q.   Okay.  Did you participate in any way in the

19 January 6th event?

20 A.   No.

21 Q.   Did you know about Mr. Rhodes' involvement in the

22 January 6th event?

23 A.   Well, I watched things on TV, so I know what

24 everybody else knows, which is through public open

25 source information, you know.  I read the articles.

1   Q.   So he didn't tell you anything about his plans

2   beforehand?

3   A.   No, no.

4   Q.   You mentioned that you're employed.  What do you

5   do?

6   A.   I drive for ride share companies. I do some

7   consulting as well.  I don't want to give the name of

8   which company, if that's okay, but -- or which

9   companies --

10  Q.   What kind of consulting work?

11  A.   Political.

12  Q.   I'm sorry?

13  A.   Political, like campaigns.  I help with campaigns.

14  I've been doing that for years.

15  Q.   Tell me a little bit more about what you do.

16  A.   So, you know, there's block walking that's involved

17  with campaigns.  There's social media that's involved.

18  There's just all the different aspects of a grass roots

19  campaign.  And so I've been involved in that for years.

20  And I also do a lot of ride share, though, late at

21  night.  So it's between those two things that would

22  constitute my employment.

23  Q.   And what's your typical job schedule?

24  A.   I drive pretty late when I do the driving.  As far

25  as the campaigns is concerned, that could be going to

1  meeting and events in the evening.  So it's more of an

2  evening type of thing.  It's an evening late type of

3  thing as opposed to a morning thing with me in terms of

4  my daily schedule.

5  Q.   Okay.  I know you testified you have no firearms in

6  your house.

7  A.   Right.

8  Q.   Do you have any drugs in your house?

9  A.   No.

10 Q.   If the Court were to release Mr. Rhodes into your

11 custody, you would be required to notify the Court if

12 he violates any conditions of his release.  Do you

13 understand that?

14 A.   I do.

15 Q.   And no other person lives with you; is that correct?

16 A.   That's correct.

17 Q.   Is my understanding correct that right now you're

18 in a one-bedroom apartment, but I guess you're willing

19 to move to a two-bedroom --

20 A.   Right.

21 Q.   -- if Mr. Rhodes can come live with you?

22 A.   Right.

23 Q.   And that would take a couple of days?

24 A.   Yeah, it's going to take a few days, yeah.

25 Q.   You've never had Mr. Rhodes stay with you before,

1   though; correct?

2   A.   No.

3           THE COURT:  All right, thank you, sir.  You

4   may step down.

5           MR. LINDER:  Yes, Your Honor, just to make the

6   Court aware, I've got my client's sister who is in

7   Minnesota, and his cousin who lives in California,

8   friends from Houston.  There are several people here

9   that I won't name that are all here in support of

10  Mr. Rhodes.

11          And as I told you, there are two people

12  that would be third party custodian connections, if you

13  need that, in addition to the ones stated, and I've

14  provided that to the probation officer also.

15          THE COURT:  All right, thank you.

16          So no other witnesses, Mr. Linder; correct?

17          MR. LINDER:  Correct, Your Honor.

18          THE COURT:  Did you want to move the letters

19  that you submitted to the Court as an exhibit?

20          MR. LINDER:  Yes, Your Honor.

21          THE COURT:  Any objection?

22          MS. RAKOCZY:  No objection.

23          THE COURT:  All right.  All of the letters

24  that were submitted to the Court on behalf of

25  Mr. Rhodes are admitted as Defendant's Exhibit 1.

1         MR. LINDER:  Your Honor, I will note, you

2  probably saw in the letter, but one of those letters

3  stands out without saying his name.  You've got it in

4  front of you.  He is a senior partner of a large

5  national firm and he's willing to stake his reputation

6  on Mr. Rhodes.  He wrote a very nice letter that you've

7  got before you.

8         THE COURT:  All right, thank you.

9              I'll hear closing statements at this time.

10         MS. RAKOCZY:  Thank you, Your Honor.

11         *(Counsel's microphone off during argument)*

12              Your Honor, with respect to the nature and

13  circumstances of the offenses in which the defendant is

14  charged, he's not charged with a crime of violence, but

15  he is charged with orchestrating a plot to [U/I] mobs

16  surrounding the Government for the transfer of

17  Presidential power in this country.

18              The Government [U/I] that is difficult to

19  [U/I].  And the courts have recognized that a harm to

20  the union is a harm to the society, if not to the

21  nation, that can be considered as part of the danger

22  the defendant is posing to the community.

23              You've heard testimony here today [U/I]

24  he put forth a plan to include co-conspirators.  He

25  offered reimbursement and financial incentives to

 1  encourage people to participate.  And he was one of the

 2  architects of this plan how to arm Quick Reaction Force

 3  available on standby to ready weapons, ready firearms,

 4  and transfer those firearms into the hands of

 5  co-conspirators on the grounds at a moment's notice.

 6  The Government submits to this Court that shows an

 7  extreme disregard for the danger and safety of the

 8  community and also for the laws of the United States,

 9  which made it very difficult for this Court to trust

10  that the defendant can comply with conditions of

11  release.

12            The Court has heard evidence that the

13  defendant and his co-conspirators then took this plan

14  and utilized it to engage in an attack on the United

15  States Capitol.  The Government has mentioned during

16  this hearing and in his papers words of the defendant

17  in orchestrating this conspiracy, and the defense made

18  reference to the Government saying just words.  But we

19  are not saying just words here.  We base those words on

20  import.  It's the conduct of the defendant and his

21  co-conspirators they engaged in on January 6th and

22  thereafter, continuing to purchase firearms, continuing

23  to gather themselves together and to ready themselves

24  for conduct to forcibly oppose the peaceful transfer of

25  power in this country.

```
 1              The statements that the defendant made did
 2   not stop during the time period of this conspiracy.  We
 3   heard testimony that the defendant continued to make
 4   statements regarding the regime, the current
 5   Presidential administration being illegitimate, and
 6   that the Court [U/I].  He has utilized his military
 7   background, his legal training, and his position as the
 8   leader of this nationwide organization to further the
 9   goals of this conspiracy.  We think the Court needs to
10   consider that, the threat that the defendant continues
11   to pose to our community.
12         THE COURT:  Counsel, let me ask you a question
13   about that because I don't disagree with what you just
14   said.  I don't agree with Mr. Linder's characterization
15   that they're just words.  Yes, we have a right to free
16   speech, but when your speech is intended to essentially
17   cause violence, then, you know, that's you're here
18   today.
19              But there are conditions that the Court
20   could implement regarding the use of social media and
21   electronic devices.  And so my question for you in
22   terms of monitoring any electronic device that
23   Mr. Rhodes had access to.  So my question is, why
24   would that not -- why would that condition, along with
25   others, not be sufficient in this case?
```

1            MS. RAKOCZY:  Your Honor, our conversations

2    with Pretrial Services were with the District of

3    Columbia and not with your office here.  In our

4    conversation with Pretrial Services, we've learned it

5    is difficult to monitor a defendant's electronic

6    communications.  They can take the extreme step of

7    installing tracking software on cell phones and

8    computers, but they can't be present in the home at all

9    times.  And we heard that the custodian who was

10   proffered here today is someone who is a very busy

11   person who works, it sounds like many hours.  He's an

12   industrious person, but unfortunately that means he's

13   not going to be around all the time and he can't say

14   that someone is not going to drop by the house and

15   provide a device or something that the defendant could

16   use to access the Internet.

17           And so we do have a concern that with all

18   of those contentions, Pretrial and this Court could

19   try to keep the defendant from having access to those

20   platforms, but he knows how to use encrypted messaging

21   applications and could have access to such devices if

22   someone should make it available and help him out.  He

23   can be sincere when he says he would do his best, but

24   he's one person and he's not going to be with the

25   defendant all the time.

1          THE COURT:  One of the questions that I asked
2    the agent that is still a question in my mind:  This
3    occurred over a year ago, the January 6th incident, and
4    we've heard about conversations that Mr. Rhodes has had
5    shortly after the January 6th event.  But in the last
6    year there doesn't seem to be any evidence, at least
7    that was presented here today to support that he's a
8    continuing danger or a flight risk or could potentially
9    obstruct justice.

10          MS. RAKOCZY:  We would [U/I] with that, Your
11   Honor.  But the witness did proffer today and it has
12   been alleged in the Indictment that Mr. Rhodes, number
13   one, engaged in obstruction with respect to his own
14   phone.  The Special Agent did mention that an associate
15   of the defendant did put forth a recommendation that
16   other co-conspirators took the evidence from their
17   phones.

18              In addition to that, the defendant does
19   continue -- did continue to remain in touch with
20   co-conspirators on his phone.  The witness proffered
21   that he does continue to make statements suggesting
22   that the regime is illegitimate.

23              For all that he said, we would also note
24   that some of his efforts have been hampered by the
25   fact that there have been arrests of a number of his

1  co-defendants in this case.  [U/I] think that the

2  defendant himself is not a danger because he does still

3  have his platform, he does still have his influence,

4  and he does still have members and affiliates involved

5  in who are willing to continue to follow him and to

6  raise [U/I].

7            THE COURT:  Okay.  You may continue if you

8  have anything else.

9            MS. RAKOCZY:  Thank you, Your Honor.  Just

10 briefly.  The defense pointed out to your question to

11 Special Agent Palian, who is detained, who is not

12 detained in this case.  We know this Court has to make

13 its own decision on the basis of the evidence to the

14 Court, but in the event that [U/I] in this Court's

15 determination, the District Court Judge in the District

16 of Columbia [U/I] had the opportunity to reveal appeals

17 of some of the detention orders.  And they make

18 decisions about who would remain detained or who would

19 be released.  As noted repeatedly, the decision-making

20 process that for him was one of the most significant

21 factors whether defendant played a leadership role in

22 this conspiracy.

23            So the defendants who are currently

24 detained -- Kelly Meggs, Jessica Watkins, and Kenneth

25 Harrelson -- are all alleged to have played roles.

 1             Kelly Meggs was a leader of Stack 1 and a
 2   leader of the Florida Chapter of the Oath Keepers.
 3             Kenneth Harrelson was [U/I] and a deputy
 4   to him in the leadership of both Stack 1 and that
 5   Florida group.
 6             Jessica Watkins was also a member of that
 7   Stack 1 and a leader of the Ohio contingent that
 8   participated in that Stack 1.
 9         THE COURT:  Wasn't Joshua James also a leader
10   of the Alabama Oath Keepers and it looks like he was
11   released?
12         MS. RAKOCZY:  Yes, Your Honor, he was
13   released.  He was initially detained, but then released
14   upon appeal.  I don't want to speak for the judge, but
15   it sounded during that hearing as though some of the
16   major factors in that particular case were the
17   defendant's ties to his community and his employment.
18   He also had an outstanding military record, including
19   receiving a couple of [U/I].  Those are some of the
20   factors that appear to have influenced [U/I] with
21   respect to Joshua James.  But he did play a leadership
22   role with respect to Stack 2.
23             I would also note, Your Honor, that the
24   Defendant Edward Vallejo has just been arrested and
25   detained by the judge in Arizona.  Our judge in the

1   District of Columbia has not reviewed any appeals of

2   that decision at this point, but [U/I] in the District

3   of Arizona did make the decision to detain Mr. Vallejo

4   when he was arrested.  He is also someone, like

5   Mr. Rhodes, who did not breach the Capitol, yet he was

6   in the District of Columbia because he was serving in a

7   role as a Quick Reaction Force member.  A plan that we

8   had submitted to the Court and was shown today was the

9   plan that Mr. Rhodes put into place and then he

10  orchestrated.

11          And so [U/I] the use of weapons for this

12  conspiracy and the readiness of Mr. Rhodes and his

13  co-conspirators to have those weapons on hand and to

14  bring them in, if necessary, is part of this

15  dangerousness that concerns the Government currently.

16          We would just also note that with respect

17  to the risk of flight issue, I know the Court asked the

18  witness a couple of questions.  We would point out in

19  the summary the witness didn't mention this, but he did

20  testify to the fact that on January 6th, when the

21  defendant learned that law enforcement was potentially

22  coming for him and for others who participated in the

23  attack on the Capitol, he did flee at that time.  And

24  [U/I] didn't come out and tell us, but those were some

25  of the circumstances where he [U/I] opportunity at that

1  point to be [U/I] home.  So there is some evidence

2  before Your Honor that the defendant had in the past

3  engaged in flight and who could potentially do it again.

4        We've also proffered the evidence that the

5  defendant and his organization has contacts throughout

6  the United States.  We don't think he's necessarily an

7  international flight risk.  He doesn't have a passport

8  as far as we know.  But it would not be impossible for

9  him to find an associate anywhere in this country to

10 take his stuff, which as the witness said was very

11 mobile and go underground and somewhat difficult to

12 find if we wanted to.

13        For all these reasons, Your Honor, the

14 fact that a Grand Jury has found probable cause to find

15 the defendant engaged in this plot to forcibly oppose

16 the peaceful transfer of power in this country, and

17 then deleted evidence of these crimes, we submit that

18 there just aren't conditions or a combination of

19 conditions that can ensure the safety of the community

20 and [U/I].

21        THE COURT:  Thank you.

22        MS. RAKOCZY:  Thank you.

23        THE COURT:  Mr. Linder?

24        MR. LINDER:  Yes, Your Honor.

25        *(Counsel's microphone off during argument)*

1            The Arizona Court, to touch on something

2  that the prosecutor just mentioned, the Arizona Court

3  in the Vallejo hearing actually did their hearing via --

4  we were able to listen to it.  It wasn't on Zoom, but

5  we were able to listen to it.  And the reason the Judge

6  detained Mr. Vallejo in that case, who didn't go in the

7  Capitol, the emphasis he put was that he was sitting on

8  a cache of guns at the QRF.  He was the guy that was

9  there that could have brought the guns had he wanted to.

10 That's what the judge [U/I].

11            Our client was never at the QRF and wasn't

12 at the Capitol.  So that was --

13            THE COURT:  Right, Mr. Linder, but just

14 because he wasn't physically present, he was

15 responsible, at least based on the evidence that was

16 shown today, for facilitating others and himself in

17 terms of bringing ammunition to have on hand if and

18 when they wanted to use it; right?

19            MR. LINDER:  He was one of the people.  There

20 were different chat rooms from different groups and

21 there were different QFRs that he wasn't involved in.

22            THE COURT:  So how is he any different is my

23 question?

24            MR. LINDER:  Well, he didn't breach the

25 Capitol.  He didn't assault a police officer.  He

1   didn't have a weapon.  He didn't do anything illegal

2   other than just [U/I] on trespasses and those things,

3   and speech, and that's not in today's hearing.  But he

4   didn't -- anything that they want to say that he did

5   was dangerous [U/I] anybody hear of.  And [U/I].  The

6   agent wasn't able to offer any information today, and

7   neither has opposing counsel, that he's done anything

8   to incite any of this violence or do anything for the

9   last six months.

10          If he wanted to come under the radar, he

11  could have done so.  The FBI had his phone number and

12  they called him and they meet with them, he gives them

13  his phone and gives them the code.  And when he told

14  them that I'll surrender and go to DC if you're going

15  to indict me, just call and I'll go to DC and turn

16  myself in.  And when they were going to arrest him here

17  at Chad Roberts' house, they call him.  They were

18  outside and he walks out.  He's not anybody who's

19  trying to do anything.  He's never broken the law.  He

20  doesn't have any criminal record.  He was honorably

21  discharged.  He's a Yale Law Graduate.  He has no

22  criminal history.

23          THE COURT:  Well, I actually have a question

24  about -- I do know he graduated from Yale Law School

25  and practiced law for a period of time.  The

1    information I have in the Pretrial Services Report
2    states that he was disbarred in 2007.  Do you know why?
3            MR. LINDER:  I'll speak in generalities.  He
4    had a personal family matter going on and they
5    allegedly brought the case before the court and
6    grievance committee and they disbarred him.  It wasn't
7    anything where he stole clients' funds or anything
8    [U/I] or anything like that.  But [U/I].
9            THE COURT:  The Pretrial Services Report also
10   states that his employment is essentially the founder
11   of Oath Keepers and that he, you know, gets all of his
12   salary from that job.  If he were to be released,
13   what's the intent going forward, at least until his
14   trial, in terms of his role with the Oath Keepers?
15           MR. LINDER:  Very good question.  As you know,
16   the one witness who's a senior partner in the law firm
17   can vouch for him.  And we anticipated he would be a
18   work [U/I].  He has a job writing appellate briefs and
19   could do that and assist on different levels at
20   different law firms.  He's done that in the past and he
21   could do it again.
22           THE COURT:  With who?  With the lawyer that
23   wrote the letter?
24           MR. LINDER:  Yes.  And other law firms, but
25   he's done that in the past and lawyers have hired him

1  to do constitutional issues and briefs and they could
2  put him to work.  We've already [U/I].

3            And as far as to respond to what the
4  Government said about my client, monitoring his
5  electronic communication, the Oath Keepers is a public
6  organization.  Even if he was communicating
7  surreptitiously, it's a public platform, it's going to
8  get out.  They're monitoring all these people.  He
9  hasn't talked to any of the co-defendants that have
10  been indicted.  They've been indicted and he can't do
11  that.  He hasn't tried to do that.

12       THE COURT:  I don't think the public platform
13  is what the Government is worried about.  I mean,
14  there's evidence that he was messaging, sending
15  encrypted messages.

16            And, you know, this Court has imposed the
17  condition before to have software monitored.  But the
18  Government does raise a fair point, which is the
19  proffered third party custodian will not be there all
20  the time.  Mr. Rhodes does appear to have a number of
21  associates, as they've been referenced, other members
22  of Oath Keepers.  And even members -- maybe people that
23  are not members of Oath Keepers, but that agree in his
24  beliefs that would possibly be willing to give him.  I
25  mean, obviously at some point it's just not possible to

```
 1  monitor.  And so I think that's a fair point.
 2              The other -- and you know this,
 3  Mr. Linder.  Really, in a case of involving child
 4  pornography, that's the easiest way to really be able
 5  to monitor a phone because you can monitor for a
 6  specific type of search.  With encrypted messaging and
 7  things like that, it's just it's more difficult.
 8              MR. LINDER:  I understand.  And I understand
 9  what the Court is saying.  I agree, but it's not
10  impossible.  There could be restrictions put on him
11  where he doesn't have a phone, or has a certain phone
12  that belongs to somebody else.  And I don't think with
13  the nature of this case and the publicity this case has
14  gotten, I don't think anybody is going to risk doing
15  that.  If he's the number one guy on this Indictment, I
16  don't think people are going to go slipping him cell
17  phones and risk getting arrested by the FBI.  I don't
18  think anybody would want to risk that.  I don't think
19  he would want to risk that.
20              THE COURT:  Well, I don't think I'm with you
21  on that.  But your proffered third party custodian, I
22  know that his mother is deceased, he does not have
23  contact with his father.  He does have a sister.  But
24  the relationship between the proffered third party
25  custodian and Mr. Rhodes does not necessarily seem
```

1  sufficient to me for him to be a suitable third party

2  custodian.

3          MR. LINDER:  Which is why I offered backups to

4  kind of assist in that.

5          THE COURT:  Right, but they're backups just

6  saying they would check in on him.

7          MR. LINDER:  Right.  And I know one of them

8  would have -- or two of them would have daily

9  communication, not just once a week.  They talk daily.

10          THE COURT:  Okay.  All right, thank you.

11              Anything else?

12          MS. RAKOCZY:  No, Your Honor.  Thank you.

13          THE COURT:  Mr. Linder?

14          MR. LINDER:  Are we just closing or are we

15  just --

16          THE COURT:  Well, yeah, this is closing.

17  Would you like to say anything else?

18          MR. LINDER:  We got into a question and answer.

19          THE COURT:  Okay, I'm sorry, go ahead.

20          MR. LINDER:  I don't know if the Court's

21  aware.  Your coordinator said you might be aware.  He

22  was actually cooperating with a Congressional subpoena.

23  He has a lawyer in DC.  He's supposed to testify on

24  February 2nd before Congress.  If DOJ had waited a month

25  for this Indictment, they could have got his testimony

1   in front of Congress and used that, but they avoided

2   that.   And so there are people in DC that are not very

3   happy about this Indictment because now he can't

4   testify.   He was cooperating with a Congressional

5   subpoena in addition.

6                    And I also provided the Court with the

7   U.S. vs. [U/I], which I gave to counsel for the

8   Government, that basically says what I elicited on

9   cross-examination of the agent.   The Government can

10  indict whoever they want within [U/I].   We know that.

11  They can do it this year, next year, whatever.   But

12  it's very disingenuous to sit on something for a year

13  and say:   Oh, this guy's dangerous for all this stuff

14  he did in January, but we're going to sit on for a year

15  and indict him later.

16                    And they call him dangerous.   If they

17  knew he was dangerous, they should have sworn out a

18  complaint.   Saying he's a danger now is disingenuous

19  when they can't bring any activity that he's done,

20  anything other than deleted messages before May of last

21  year [U/I].   But other than some deleted messages, they

22  can't bring anything to show that he's a danger.   And

23  so I kinda find that --

24                    In additional, the last thing, counsel

25  wrote a brief -- counsel for the Government wrote a

1   brief, and on page 15, bottom of page 15, the last
2   sentence and it runs over on the top of page 16.  It
3   said, "It's difficult to imagine conduct that poses a
4   greater risk to our society that ones targeted at
5   undermining the laws and procedures at the heart of our
6   democratic process."
7            If there's nothing greater, then why are
8   they [U/I].  That's -- to me, that's the most
9   disingenuous part of this.  And I know it's not their
10  call.  There are obviously people above them and they
11  all submit that call.  But to me that speaks volumes
12  that they don't really think he's a danger.
13           And one other thing on flight risk, Your
14  Honor.
15       THE COURT:  Well, but they're not just moving
16  on danger.
17       MR. LINDER:  They moved on both, danger and
18  flight risk.  They brought out evidence of both.
19       THE COURT:  Well, right.  But under
20  3142(f)(2), they are moving under flight and
21  obstruction.
22       MR. LINDER:  Correct.  But one other thing on
23  flight, Your Honor, and I'll wrap it up.
24           This is not the [U/I] we have on our case
25  where someone is trying to do everything in secret, get

1  out of jail, run to Mexico, get out and go wherever

2  they want to.  Mr. Rhodes, whether you like it or not,

3  had a platform.  And even if he's not allowed to

4  participate in that platform going forward if he's on

5  release -- and I assume he would not be able to

6  participate in that -- him running and hiding and not

7  standing in trial avoids the very purpose of everything

8  he stands for.  I don't think he just wants a public

9  trial.  I think he wants a speedy public trial.  And

10  he's going to do everything he can to make that happen.

11          And I just think this is not the typical

12  case we see and hear where some people tend to run.

13  It's not an event with him where people that [U/I] him

14  in the past or people that he wants to maybe hurt in the

15  future running and fleeing from the court, all of that.

16  So that's what makes it different.

17          THE COURT:  Let me ask you one question before

18  you sit down.  I'm going to take a little bit of time

19  today to think about this.  But do you have anyone else

20  to offer as a third party custodian?

21          MR. LINDER:  We can talk -- there's lots of

22  people in court.  Great question.  Would the Court

23  allow him to move to another district with a family

24  member?

25          THE COURT:  Are you talking about the sister

1  in Montana?

2          MR. LINDER:  Well, we've got Minnesota, we've

3  got California, we've got different people that, if the

4  Court would allow him, we just didn't know if he would

5  be able to leave this district, which is why Brian has

6  an apartment in Dallas, which is the Northern District,

7  as you know; and Carrollton, which is the Eastern

8  District, which is here.  That's what we made

9  provisions for in the last few days.

10             But if the Court is flexible and will

11  allow him to be monitored in a different district,

12  we've got a lot of people.

13          THE COURT:  Well, I don't want to commit to

14  anything before I hear the testimony, but yes, I would

15  consider it.  In this particular case, the casual

16  relationship between the proffered third party

17  custodian and Mr. Rhodes is not sufficient.  And so

18  while I would consider another third party custodian, I

19  think it needs to be a more significant relationship

20  outside of the context of some of the conversations and

21  beliefs that is alleged in this Indictment.

22          MR. LINDER:  Correct.  That's why I made sure

23  before we were talking he wasn't there on the 6th, he's

24  not a member of Oath Keepers.

25             I've just been informed that the family

 1   members, both a cousin and a sister, would be willing

 2   to be third party custodians.

 3           THE COURT:  All right.  If you're prepared to

 4   put them up on the stand, then let's do that.

 5           MR. LINDER:  May I have a moment, Your Honor?

 6           THE COURT:  Yes.

 7           *[Pause]*

 8           MR. LINDER:  Your Honor, if I could avoid

 9   using the last name, we can provide that information to

10   Probation.

11           THE COURT:  Is there any objection?

12           MS. RAKOCZY:  No, Your Honor.

13           THE COURT:  Okay.

14           COURTROOM DEPUTY:  Do you solemnly swear the

15   testimony you are about to give in the case before the

16   Court shall be the truth, the whole truth, and nothing

17   but the truth, so help you God?

18           THE WITNESS:  Yes, ma'am.

19           COURTROOM DEPUTY:  Have a seat, please.

20           THE COURT:  Mr. Linder, you may proceed.

21           **BENJAMIN [LNU], CALLED BY THE DEFENSE**

22                   **DIRECT EXAMINATION**

23   BY MR. LINDER:

24   Q.  Sir, would you please state your first name -- you

25   can take off your mask.  Please state your first name

1  for the Court.

2  A.   Benjamin.

3  Q.   And are you married to one of Stewart's cousins?

4  A.   Yep.

5  Q.   And have you had a lot of interaction with Stewart

6  over the years?

7  A.   Yes, because of his cousin, but also because of his

8  uncle who lives on my property.

9  Q.   Okay.  And what state do you live in?

10  A.   California.

11  Q.   Okay.  And we can provide that information to

12  Probation, the specifics of it.

13          Do you have any criminal history?

14  A.   No.

15  Q.   Does your wife have any criminal history?

16  A.   No.  We're boring.

17  Q.   Sometimes that's better.  Do you have kids in the

18  home?

19  A.   We have four kids.

20  Q.   Okay.  And do you work outside in a regular kind of

21  job?

22  A.   I'm a C27 landscape contractor.  I do landscape

23  design and installations

24  Q.   And does your wife stay at home or does she work

25  outside the home?

1  A.   She's a stay at home mom.

2  Q.   Okay.  Do you have a room in the house?

3  A.   Actually, we have a whole separate house on our

4  property where my father and mother-in-law live.  And

5  that would be Stewart's uncle, and they're very close.

6  And they actually have an extra bedroom, bathroom, the

7  whole setup.  And actually, it's pretty regular that he

8  would go and stay there when he does come.

9  Q.   Okay, so he's been there several times anyway?

10  A.   Oh, yes, sir.

11  Q.   And do your kids think of him as an uncle?

12  A.   Yes.

13  Q.   Okay.

14  A.   Yeah, he's good with kids.

15  Q.   All right.  So you heard me ask the other

16  custodian these same questions.  Any weapons in the

17  house?

18  A.   No, not that house.

19  Q.   Okay.  And do you understand if there's weapons on

20  the property, that that be removed and taken somewhere

21  else; you understand that?

22  A.   That's fine.

23  Q.   Okay.  And I assume, based on the nature of the

24  judge's questions to me, and I know this Court, there

25  will be limitations on his electronic communications to

 1  be able to have.  Are y'all able to comply with that if

 2  he has to wear a leg monitor or not give him access to

 3  a computer, things like that?

 4  A.   Yeah, it would be easy, because actually in that

 5  guesthouse there is no Internet access.  We live in the

 6  mountains.

 7  Q.   Okay.  And any alcohol or drug use in the house?

 8  A.   Actually, no.  My wife is a recovered alcoholic, so

 9  we don't have any alcohol at all or anything.

10  Q.   Like you said, you're pretty boring?

11  A.   Say what?

12  Q.   Like you said, pretty boring.

13  A.   Yeah.  I live with four kids.

14  Q.   I understand.

15        MR. LINDER:  I'll pass the witness.

16        THE COURT:  Cross-examination?

17        MS. RAKOCZY:  Briefly, Your Honor.

18                    **CROSS-EXAMINATION**

19  **BY MS. RAKOCZY:**

20  Q.   Sir, you said that if Mr. Rhodes were to stay with

21  your family, he will stay in the guesthouse?

22  A.   Yeah, that would be correct with my -- his uncle

23  and aunt, yeah.

24  Q.   Where is the guesthouse in relation to your house?

25  A.   It's about 600 feet.  It's on the same property.

1   We have about four acres and it's about 600 feet away.

2   It's a three-bedroom, two-bathroom granny house.

3   Q.   And the other two people who live in that

4   guesthouse are Mr. Rhodes' uncle and Mr. Rhodes'

5   uncle's wife?

6   A.   Yeah.  And actually, my mother-in-law works

7   fulltime for a law firm, but my father-in-law doesn't --

8   he's a writer, and so -- and he's older, so he actually

9   never leaves.  He's always home.

10         MS. RAKOCZY:  I have no further questions.

11   Thank you, Your Honor.

12                    **REDIRECT EXAMINATION**

13   **BY MR. LINDER:**

14   Q.   And if the Probation needed to talk to them here

15   with some specifics in a few minutes, could you get

16   them on the phone?

17   A.   Yeah, I mean, this is very spur of the moment,

18   obviously, Your Honor.  But yeah, do whatever we can do.

19   Q.   Okay, thank you very much.

20         MR. LINDER:  Thank you, Your Honor.

21                       **EXAMINATION**

22   **BY THE COURT:**

23   Q.   Sir, before you step down, did you have any

24   knowledge of Mr. Rhodes' involvement in the January 6th

25   event, other than what you've heard publicly?

1    A.    Not until after.

2    Q.    Okay.  And what did you learn after?

3    A.    I mean, pretty much the big stuff, whatever the

4    news told me or that kinda thing.  There wasn't any

5    contact about that incident in his family.  So we

6    talked, but I didn't know anything about that incident

7    beforehand.  And afterwards, it was quite some time

8    before there was some communication, and it has been

9    very little since then.

10   Q.    Are you a member of the Oath Keepers?

11   A.    No.

12   Q.    Is your uncle that lives on the property?

13   A.    Most definitely not.  Nobody that lives on that

14   property is an Oath Keeper.

15   Q.    All right.  Do you understand that if you were to

16   act as a third party custodian, you  would be required

17   to notify the Court if Mr. Rhodes violated any of the

18   conditions that the Court set?

19   A.    I am now, yes, ma'am.

20   Q.    And you think you could do that?

21   A.    Yeah, I personally work a lot, and so but I come

22   home every day.  That's part of my job.  But I know

23   that his uncle, my father-in-law, never leaves.  And so

24   I think that, yeah, it would be very easy to have

25   somebody with him at all times.  Is that what you're

1  alluding to?

2  Q.   Right, not just be with him at all times, but also

3  willing to notify the Court if he was in violation of a

4  condition.

5  A.   Yes, ma'am.

6          THE COURT:  All right, thank you.  You may

7  step down.

8          All right.  We'll stand adjourned.  I will

9  issue an opinion in the next 24 to 48 hours.

10         MS. RAKOCZY:  Your Honor, would the Court --

11  the Government would request that if the Court should

12  issue a decision to release the defendant, you will let

13  us know?

14         THE COURT:  Yes, I will do that.

15         All right.  We'll stand adjourned.

16         *[12:42 p.m. - Proceedings adjourned]*

17         *[3:14 p.m. - Proceedings re-opened]*

18         THE COURT:  Good afternoon.  We're here on

19  the record.  4:22-mj-11, United States vs. Elmer

20  Stewart Rhodes, III.

21         For the record, this morning the Court

22  held a Detention Hearing.  Testimony was presented by

23  both the Government and the defendant.  After the

24  hearing, Mr. Rhodes', I believe, soon-to-be ex-spouse,

25  Ms. Tasha Adams, contacted the Court to communicate

1  concerns for her, as well as her children's safety, if

2  he were to be released.

3        Ms. Adams, I made a request that you be

4  asked if you'd be willing to provide those statements

5  on the record.  It's my understanding that you said

6  yes.  So I then contacted counsel for the Government

7  and counsel for defendant so that your statements could

8  be made on the record with both counsel present.

9        So, typically, we have you testifying in

10 response to questions.  I think we'll start off,

11 Ms. Adams, if you wouldn't mind, just stating your full

12 name for the record and spell it.  And then I'll just

13 allow you to speak, to communicate to the Court what

14 you want to communicate regarding Mr. Rhodes.

15                **TASHA VONN ADAMS RHODES**

16                   **OPENING STATEMENT**

17       MS. ADAMS:  Okay.  My name is Tasha Vonn Adams

18 Rhodes.  T-a-s-h-a V-o-n-n A-d-a-m-s, and then Rhodes,

19 R-h-o-d-e-s.

20        I was married to Stewart in 1994 and filed

21 for divorce in February 2018.  We are still not legally

22 divorced.  We have six kids together.  Just wanted to

23 just express that he was extraordinarily violent during

24 our marriage and often used firearms to control us.

25 Not always necessarily pointing them right at us, but

 1  waving them around the room, screaming, yelling,

 2  pointing them at his own head.  Even if someone just

 3  wanted to step outside or go to the store, he kept us

 4  very isolated.

 5              In addition to that, I still wanted to let

 6  the Court know that his lifestyle was very much about

 7  eventually escaping if he were ever what he called

 8  picked up by the Feds, that he rented backhoes and dug

 9  elaborate escape tunnels in our back yard, had

10  unregistered cars waiting out in the woods to escape,

11  purchased hundreds of dollars in razor wire that he

12  needed to string up around the property and hide in

13  bushes in case the Feds ever came to his door.

14              And I just think he's a huge danger and a

15  flight risk.

16                        **EXAMINATION**

17  **BY THE COURT:**

18  Q.   When you say that he pointed -- he oftentimes used

19  firearms to threaten and isolate you, are you talking

20  about you alone or you and your children?

21  A.   Mostly me.  With the kids, the threat was -- it

22  was -- it was more physical, just hands-on physical

23  violence.  But he would excuse and say, "Oh, I didn't

24  mean to do that."  But, I mean, sometimes he would

25  just, if he was angry, he would suddenly want to

1    practice martial arts and, you know, he would punch the

2    kids or, "Oh, you know, I didn't mean to do that.  But

3    it was always in direct -- directly involved, you know,

4    if he was really angry or not.

5            But then there were times when he did just

6    completely lose it.  And at one point he just, I don't

7    know, just choked my daughter and had to be removed by

8    my son.  And these fits became things that used to

9    happen every so many years when he'd just sort of

10   mentally break down.  It started happening every few

11   weeks in the last couple of years from like 2016 on.

12   Just started happening more and more.  And it took us

13   about -- it was really my adult kids saving money and

14   helping us, helping me and the other kids get out with

15   an attorney, that we would not have gotten out.

16           And we were actually afraid that though he's

17   very, very afraid of going to prison, my biggest fear

18   with him was like a murder-suicide type thing.  It's

19   just he'd just go all out.  And the gun waving was

20   happening more and more until one of the last events.

21   You know, my kids actually saw a bit of it.  And most

22   of that was done more in private, but he was getting

23   more and more blatant with it.

24   Q.   Did you ever obtain a restraining order or anything

25   like that against him?

 1  A.   I'm sorry.  I applied for one.  It was denied.

 2  Q.   And when was that?

 3  A.   That was 2018.

 4  Q.   Okay.

 5        THE COURT:  All right, does either counsel

 6  have any questions of Ms. Adams?

 7        MR. BRIGHT:  Kate, I'll let you go first.

 8        MS. RAKOCZY:  No questions for the Government,

 9  Your Honor.  Thank you.

10        MR. BRIGHT:  Your Honor, I have a few

11  extremely brief questions.

12        THE COURT:  Okay.

13        MR. BRIGHT:  This is James Lee Bright, by the

14  way, Your Honor.

15        THE COURT:  Go ahead, Mr. Bright.

16        MR. BRIGHT:  Thank you, Judge.

17                    **CROSS-EXAMINATION**

18  **BY MR. BRIGHT:**

19  Q.   Do you prefer to be referred to you now as

20  Ms. Adams out of respect for you, ma'am?

21  A.   Yes, I'm legally Adams now.

22  Q.   Okay, I'm happy to do that.  My name is James Lee

23  Bright.  I'm one of the co-counsel defense attorneys

24  your still pending husband, Stewart Rhodes.

25        What would you say that the time frame of

1    these behavioral patterns was, Ms. Adams?

2    A.   Well, he had always been controlling and violent,

3    but it went from it would be a couple times a year to,

4    you know, drawing his handgun at the bar over his own

5    head or, you know, waving it around a lot.  After Bundy

6    Ranch, he had a pretty serious mental deterioration

7    until --

8    Q.   Ms. Adams, if I may, can you just keep it within

9    the scope of the question.

10   A.   Okay.

11   Q.   What was the time frame?

12   A.   When you're saying time frame, do you mean how

13   often was he --

14   Q.   No, ma'am.  Like what -- in years, when did the

15   last time that these events happen?

16   A.   Well, we left in 2018, February 2018.  So I would

17   say his last -- I'm going to say it was January of that

18   year, 2018.

19   Q.   2018?

20   A.   Yes.

21   Q.   Okay.

22   A.   That's the last time we saw him.

23   Q.   Did you include this in the divorce proceedings, in

24   your petition?

25   A.   Umm --

1  Q.   You didn't, did you?

2  A.   I included a lot of it.  There's really limited

3  space.  We didn't really get that far in the divorce.

4  We only got as far as the kids exclusively, not with me.

5  Q.   All right.  So it's my understanding your family

6  law attorney has reached out to me as of last week

7  asking that we help with the settlement of the final

8  orders.  Are you aware of that, ma'am?

9  A.   Yes.

10  Q.   Okay.  You're aware that I returned saying that

11  that is not an area of law that I practice?

12  A.   Okay.  Yeah, I don't know.

13  Q.   You're aware that the allegations that you're

14  making were not included in the divorce proceedings, in

15  the original petition, ma'am; is that correct?

16  A.   Honestly, I don't know what was included.  We --

17  Q.   Okay, these are pretty serious allegations --

18  A.   Yes, they are.

19  Q.   -- when you make them --

20  A.   But they were included in my restraining order

21  application.

22  Q.   They do not.

23  A.   Yes.

24  Q.   Okay.  Now, were any police reports at any given

25  time filed in these matters?

1  A.   No.

2  Q.   Okay.  So, just to clarify, there's never been any

3  police reports of -- respectfully, very serious

4  allegations.

5  A.   Yes.

6  Q.   And they were also not included in the divorce

7  proceedings; correct?

8  A.   I don't know if I can say they were or not included

9  in my divorce proceedings because, honestly, we filled

10  out so much stuff and I've just kinda lost track and it

11  was four years ago.  But I definitely included this

12  in -- his gun waving was included in the restraining

13  order and we just never got that far.  All I did was

14  apply.  We filed for divorce and then we had one

15  hearing about the kids only and that's as far as it got.

16  Q.   Understood.  So you've had no contact with him in

17  three, four years?

18  A.   Yeah, no, only just one line, you know, statements

19  like I want to talk to the kids.  And then I would tell

20  him the time and he would agree.

21  Q.   Not a problem.  And so during the period of time

22  that all those series of actions that you've alleged

23  today that were occurring, could you detail for me the

24  adult witnesses that would have been privy to that?

25  A.   That was me.

1  Q.   So no witnesses?

2  A.   No, of course not.   This is a domestic violence

3  incident that occurred in the middle of the woods.

4  This is not the kind of thing that happens publicly.

5  Q.   Did you ever have the opportunity to report these

6  to a good friend or somebody that we could contact to

7  verify them?

8  A.   No, I had no friends.

9  Q.   Okay.

10  A.   Or really, I was not in contact with any of my

11  family at that time.

12  Q.   Understood.   Did you have the opportunity to

13  memorialize any of this in photographs or anything

14  else?

15  A.   No.

16        MR. BRIGHT:   Your Honor, l pass the witness.

17        THE COURT:   All right.   Any other questions?

18  Government's counsel?

19        MS. RAKOCZY:   Not from the Government.   No,

20  Your Honor, thank you.

21        THE COURT:   All right.   Ms. Adams, I don't

22  have any questions for you.   Thank you for reaching out

23  and providing the information.   And you are dismissed

24  at this time, so you can leave the phone call.

25        MS. ADAMS:   Okay.   Thank you very much for

```
 1  your time.

 2            THE COURT:  You're welcome.  Thank you.

 3            MR. BRIGHT:  Thank you, Ms. Adams.  Have a

 4  good day, ma'am.

 5            MS. ADAMS:  Thank you.

 6            THE COURT:  All right.  Counsel, before we go,

 7  I wanted to give each of you an opportunity to make any

 8  statements about the testimony that was just provided,

 9  if you would like to.

10            MS. RAKOCZY:  Your Honor, this is Kate

11  Rakoczy --

12            MR. BRIGHT:  Your Honor -- yeah, I'll let you

13  go first, Kate, please.

14            MS. RAKOCZY:  That's fine, thank you.

15            (Counsel's microphone off during argument)

16            Your Honor, Kate Rakoczy on behalf of the

17  United States.  I did want to make sure I let the Court

18  know out of candor and let counsel know that the FBI

19  interviewed Ms. Adams at her residence, I believe,

20  early last week or the previous week, shortly after

21  Mr. Rhodes' arrest.  I will provide a copy of that 302

22  to defense counsel and can provide a copy to the Court

23  as well, if the Court would like.  I say that only just

24  so the Court is aware of it, that we did interview

25  Ms. Adams.
```

1            We do find the information that she has

2  to share very concerning with respect to Mr. Rhodes as

3  dangerous and his stability.  The only reason we did

4  not proffer the evidence at the hearing is that we

5  learned this information very recently and have not had

6  the opportunity to corroborate the information,

7  although I think as the witness points out, it would be

8  difficult to corroborate, as are many domestic violence

9  allegations of that nature.

10            And I don't think that's a reason to

11  discredit the information.  I think the Court has had

12  an opportunity to hear from her and can choose to

13  assess her credibility on the basis of having heard

14  from her and heard her information.  So we do think

15  this is additional evidence of the defendant's

16  dangerousness that the Court should seriously consider

17  in making its decision.

18            THE COURT:  All right, thank you.

19            Mr. Bright.

20            MR. BRIGHT:  At your convenience, Your Honor.

21            *(Counsel's microphone off during argument)*

22            You know, Your Honor, I think it's

23  difficult, I think, to assess how to address this

24  properly.  I respectfully understand the point that the

25  Government is making, and if I was them, I would do the

120

1   same thing.

2              That being said, we should never, out of

3   hand, dismiss domestic violence allegations.  That's a

4   given.  But we have a situation whereby there is an

5   exceptionally acrimonious relationship between a to-be

6   ex-husband and a to-be ex-wife.  We have a history

7   here, according to Ms. Adams, of completely unreported,

8   completely uncorroborated, completely unrecorded

9   incidents of what, if true, would indeed be completely

10  inappropriate conduct on behalf of any given

11  individual, much less an individual that's a pending

12  defendant before the District Court.

13             But the fact that she, by her own

14  admission, says that the protective order was denied

15  speaks volumes.  I'm not a practitioner of law in the

16  state of Montana.  I don't know what their standards

17  are.  But if we extrapolate the standards in Texas law,

18  I can tell the Court, and the Court is well aware, as

19  I'm sure the prosecutors from DC are aware, that the

20  standard to get one at minimum for what would be in

21  Texas a 60-day window is incredibly low.

22             It's merely a probable cause standard.

23  More likely, would a reasonable person believe on the

24  facts at hand a crime of criminal activities occurred

25  and they happened within 60 days prior.  That's all you

 1  have to establish to get a protective order initially

 2  issued prior to a continuance order.

 3               If she was denied in Montana -- and

 4  further, it was never included in the divorce

 5  petitions, which would give any party in family court a

 6  disproportionate share of the estate, and also greater

 7  ability to control the children.

 8               I would have to say, Your Honor, that in

 9  reviewing her Twitter account, looking at the [U/I]

10  that's going on the Internet with her, I don't mean to

11  disrespect somebody that claims what is otherwise awful

12  conduct towards a woman, but I have to in this case

13  look at the motivations behind them.

14               We get back to a question like we

15  presented in court today.  If it's a danger, why did we

16  wait a year?  If he's a danger, why did she wait four

17  years to bring this up to a court when it's the

18  opportunity while she's trying to use me to serve final

19  orders on her husband in jail?

20               I'm sorry, Your Honor, I think this is a

21  disreputable claim that she's making.  The timing reeks

22  of an attempt to abuse what he's already going through.

23  And I don't -- I hate saying this with such serious

24  allegations, but when I wrap all of that together and I

25  look at the manner in which it can be used and, boom,

1    all of the sudden here we go today after she doesn't

2    say a word to any human being on earth, including in

3    her divorce petition for four years.  I hate to say it,

4    but to some extent these allegations should be

5    dismissed out of hand.

6                The Court, obviously, this is just

7    argument on my behalf and the Court will take into

8    account as they wish the allegations that she's made.

9    But I think that on behalf of Mr. Linder and I, that's

10   going to be our formal argument and stance on this

11   matter.

12        THE COURT:  I know that you had asked her

13   about the petition.  Have you seen a copy of the

14   petition?

15        MR. BRIGHT:  Your Honor, when her lawyer --

16   well, she just said that she didn't believe that it was

17   in it.  And so I'm going to take Ms. Adams at her word

18   when she tells us about her petition and then --

19        THE COURT:  Well, I think she came back around

20   to saying she couldn't say that, that she didn't know.

21   So I don't know if you're asking or because you really

22   don't know, or you're asking her, but you already know

23   the answer.

24        MR. BRIGHT:  No, Your Honor, I asked that

25   question of her initially.  She said at first she

1  didn't remember.  Then she said she doesn't know.  And

2  so I'm going to accept her at face value.  And when I

3  get those kinds of answers from a divorce petition, I'm

4  going to trust that she didn't have it in there.

5           I've been through a divorce.  I remember

6  damn well everything in my petition.  That's not

7  something people forget.  Those situations can be

8  emotionally scarring.  And I find it extremely

9  difficult to believe that for such significant

10  allegations you wouldn't even be able to remember

11  whether it was in your petition or not.

12           I just don't find that credible, Your

13  Honor.  I apologize.

14          THE COURT:  All right.  Let me ask you this,

15  Mr. Bright.  Do you know -- I know that there's been

16  about a four-year separation between Ms. Adams and

17  Mr. Rhodes.  It's my recollection from the Pretrial

18  Services Report that although Mr. Rhodes contributes

19  money for support of the children, he does not see

20  them.  Is that accurate?

21          MR. BRIGHT:  That is my understanding, yes,

22  Your Honor.  I believe that is part of the acrimonious

23  nature.  I have spoken with Mr. Rhodes about this.  And

24  again, I'm not -- none of us are privy to the

25  interworkings of these two.  But it has been relayed to

1  me that kind of in your -- that there has been some

2  withholding of visitation with the children.  I believe

3  some of that has to do with politics.  I think some of

4  that has to do with, as I understand it, she used to be

5  a Jehovah's Witness and has converted to -- and I will

6  plead ignorance as to the exact details of the nature

7  of what it means to be a Wiccan.  But I believe, if I

8  understand correctly, it's some form of pagan witch

9  type practice.  And obviously, Mr. Rhodes is Messianic

10 Jewish, Christian tradition.  Again, but I plead

11 ignorance as to the details of what all that means.

12 But the wedge between these two, to my understanding,

13 is such that he has not seen his children in years.

14          THE COURT:  Okay.

15          MR. BRIGHT:  And has been -- by her own words

16 just now, they don't communicate or have any contact

17 with each other, which is why I would say I'm a bit

18 confused why she's so concerned about her safety when

19 she hadn't seen him in four years.

20          THE COURT:  Okay.  All right.  Well, thank you

21 both for being available on such short notice for this.

22 I appreciate it.

23          MS. RAKOCZY:  Thank you very much, Your Honor.

24          MR. BRIGHT:  Thank you for your time, Your

25 Honor.  Please let us know if you need anything further.

1          THE COURT:  Thank you.  We'll stand adjourned.`

2          *[3:34 p.m. - Proceedings adjourned]*

3

4               C E R T I F I C A T I O N

5

6     I certify that the foregoing is a correct

7  transcript of the electronic sound recording of the

8  proceedings in the above-entitled matter.

9

10

11  /s/ Gwen Reed

12  1-28-22

13

14

15

16

17

18

19

20

21

22

23

24

25

*GLR TRANSCRIBERS*
9251 Lynne Circle
Orange, Texas 77630 * 409-330-1610